## GOODMAN ET AL. *v.* LUKENS STEEL CO. ET AL.

No. 85–1626. Argued April 1, 1987—Decided June 19, 1987*

---

*Together with No. 85–2010, *United Steelworkers of America, AFL–CIO–CLC, et al.* v. *Goodman et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, J., joined, in Part I of which POWELL and SCALIA, JJ., joined, and in Part II of which BRENNAN, MARSHALL, and BLACK-MUN, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and BLACKMUN, JJ., joined,

post, p. 669.   POWELL, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, and in Parts I, II, III, and IV of which O'CONNOR, J., joined, post. p. 680.   O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, post, p. 689.

*Robert M. Weinberg* argued the cause for petitioners in No. 85–2010 and for respondent Union in No. 85–1626. With him on the briefs were *Julia Penny Clark, Michael H. Gottesman, Laurence Gold, David Silberman, Bernard Kleiman,* and *Carl Frankel.*

*William H. Ewing* argued the cause for petitioners in No. 85–1626 and for respondents in No. 85–2010.   With him on the briefs for petitioners in No. 85–1626 were *Arnold P. Borish* and *Daniel Segal.*   Messrs. Ewing, Borish, Segal, and *Leslie A. Hayes* filed a brief for respondents in No. 85–2010.†

JUSTICE WHITE delivered the opinion of the Court.

In 1973, individual employees[1] of Lukens Steel Company (Lukens) brought this suit on behalf of themselves and others, asserting racial discrimination claims under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,*[2] and 42 U. S. C.

---

†Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Carvin, Roger Clegg,* and *David K. Flynn;* and for the Lawyer's Committee for Civil Rights Under Law et al. by *Robert F. Mullen, Harold R. Tyler, James Robertson, Norman Redlich, William L. Robinson. Judith A. Winston, Richard T. Seymour, Joan Bertin, Judith L. Lichtman, Grover G. Hankins, Antonia Hernandez,* and *E. Richard Larson.*

*Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

[1] The United Political Action Committee of Chester County was also a plaintiff in the case.

[2] The part of Title VII relevant to the suit against the Unions is 42 U. S. C. § 2000e–2(c), which provides:

"(c) Labor organization practices

"It shall be an unlawful employment practice for a labor organization—

§ 1981[3] against their employer and their collective-bargaining agents, the United Steelworkers of America and two of its local unions (Unions).[4]   After a bench trial, the District Court specified the periods for which Title VII claims could be litigated; it also reaffirmed a pretrial order that the Pennsylvania 6-year statute of limitations governing claims on contracts, replevin, and trespass[5] applied to the § 1981 claims and that claims with respect to the period after July 14, 1967, were accordingly not barred.   On the merits, the District Court found that Lukens had discriminated in certain respects, but that in others plaintiffs had not made out a case.[6]   The District Court concluded that the Unions were also guilty of discriminatory practices, specifically in failing

---

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

[3] Section 1981 reads as follows:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[4] United Steelworkers of America is the certified bargaining agent. The two locals act on its behalf.

[5] Pa. Stat. Ann., Tit. 12, § 31 (Purdon 1931), repealed by Judiciary Act of 1976, Act No. 142, 1976 Pa. Laws 586.   Under the 1976 Act, the new statute of limitations does not apply to claims arising prior to June 27, 1978.

[6] The judgment against Lukens is not at issue in the cases brought here.

to challenge discriminatory discharges of probationary employees, failing and refusing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. 580 F. Supp. 1114 (ED Pa. 1984). The District Court entered separate injunctive orders against Lukens and the Unions, reserving damages issues for further proceedings. Lukens and the Unions appealed, challenging the District Court's liability conclusions as well as its decision that the Pennsylvania 6-year statute of limitations, rather than the 2-year statute applicable to personal injuries, would measure the period of liability under § 1981.

The Court of Appeals, differing with the District Court, held that the 2-year statute of limitations controlled but affirmed the liability judgment against the Unions. 777 F. 2d 113 (CA3 1985).[7] The employees' petition for certiorari in No. 85–1626 challenged the Court of Appeals' choice of the § 1981 limitations period. The Unions' petition in No. 85–2010 claimed error in finding them liable under Title VII and § 1981. We granted both petitions, 479 U. S. 982 (1986). We address in Part I the limitations issue in No. 85–1626 and the Unions' liability in Part II.

I

Because § 1981, like §§ 1982 and 1983, does not contain a statute of limitations, federal courts should select the most appropriate or analogous state statute of limitations. *Wilson* v. *Garcia*, 471 U. S. 261, 266–268 (1985); *Runyon* v. *McCrary*, 427 U. S. 160, 180–182 (1976); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 462 (1975). In *Wilson*, the reach of which is at issue in this case, there were three

---

[7]Judge Garth dissented on the question of which statute of limitations to apply to the workers' § 1981 claim. 777 F. 2d, at 130. He acknowledged that all § 1981 claims should be treated the same; but in his view, § 1981 claims involved injury to economic rights and the personal injury characterization adopted by the Court in *Wilson* was ill suited for claims arising under § 1981.

holdings: for the purpose of characterizing a claim asserted under § 1983, federal law, rather than state law, is controlling; a single state statute of limitations should be selected to govern all § 1983 suits; and because claims under § 1983 are in essence claims for personal injury, the state statute applicable to such claims should be borrowed. Petitioners in No. 85–1626 (hereafter petitioners), agree with the Court of Appeals that the first two *Wilson* holdings apply in § 1981 cases, but insist that the third does not. Their submission is that § 1981 deals primarily with economic rights, more specifically the execution and enforcement of contracts, and that the appropriate limitations period to borrow is the one applicable to suits for interference with contractual rights, which in Pennsylvania was six years.

The Court of Appeals properly rejected this submission. Section 1981 has a much broader focus than contractual rights. The section speaks not only of personal rights to contract, but personal rights to sue, to testify, and to equal rights under all laws for the security of persons and property; and all persons are to be subject to like punishments, taxes, and burdens of every kind. Section 1981 of the present Code was § 1977 of the Revised Statutes of 1874. Its heading was and is "Equal rights under the law" and is contained in a chapter entitled "Civil Rights." Insofar as it deals with contracts, it declares the personal right to make and enforce contracts, a right, as the section has been construed, that may not be interfered with on racial grounds. The provision asserts, in effect, that competence and capacity to contract shall not depend upon race. It is thus part of a federal law barring racial discrimination, which, as the Court of Appeals said, is a fundamental injury to the individual rights of a person. *Wilson*'s characterization of § 1983 claims is thus equally appropriate here, particularly since § 1983 would reach state action that encroaches on the rights protected by § 1981. That § 1981 has far-reaching economic consequences does not change this conclusion, since such impact flows from

guaranteeing the personal right to engage in economically significant activity free from racially discriminatory interference. The Court of Appeals was correct in selecting the Pennsylvania 2-year limitations period governing personal injury actions.

We also agree with the Court of Appeals that the 2-year statute, adopted in compliance with *Wilson,* should be applied in this case. The usual rule is that federal cases should be decided in accordance with the law existing at the time of decision. *Gulf Offshore Co.* v. *Mobil Oil Corp.,* 453 U. S. 473, 486, n. 16 (1981); *Thorpe* v. *Housing Authority of Durham,* 393 U. S. 268, 281 (1969); *United States* v. *Schooner Peggy,* 1 Cranch 103, 109 (1801). But *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), advises that nonretroactivity is appropriate in certain defined circumstances. There the Court held that a decision specifying the applicable state statute of limitations in another context should not be applied retroactively because the decision overruled clear Circuit precedent on which the complaining party was entitled to rely, because the new limitations period had been occasioned by a change in the substantive law the purpose of which would not be served by retroactivity, and because retroactive application would be inequitable. Petitioners argue that the same considerations are present here. We disagree.

It is true, as petitioners point out, that the Court of Appeals decision in this case overruled prior Third Circuit cases, *Meyers* v. *Pennypack Woods Home Ownership Assn.,* 559 F. 2d 894 (1977); *Davis* v. *United States Steel Supply, Div. of United States Steel Corp.,* 581 F. 2d 335, 338, 341, n. 8 (1978), each of which had refused to apply the Pennsylvania 2-year personal injury statute of limitations to the § 1981 claims involved in those cases. But until *Meyers* was decided in 1977, there had been no authoritative specification of which statute of limitations applied to an employee's § 1981 claims, and hence no clear precedent on which petitioners

could have relied when they filed their complaint in this case in 1973. In a later case, *Al-Khazraji* v. *St. Francis College*, 784 F. 2d 505, 512–514 (1986), the Court of Appeals refused to apply retroactively the same 2-year statute in an employment discrimination § 1981 case because the case was filed when clear Circuit precedent specified a longer statute. Distinguishing its decision there from the case now before us, the Court of Appeals said: "In 1973, when the complaint was filed in the *Goodman* case, there was no established precedent in the Third Circuit to indicate the appropriate limitations period for Section 1981 claims." 784 F. 2d, at 512. It was obviously for this reason that the Court of Appeals here said that its decision "should be given the customary retroactive effect." 777 F. 2d, at 120. The court cited its prior decision in *Smith* v. *Pittsburgh*, 764 F. 2d 188 (1985),[8] a post-*Wilson* case in which the Court of Appeals applied retroactively the 2-year statute in a § 1983 employment termination case because of the unsettled law in the Third and other Circuits.

As for the remainder of the *Chevron* factors, applying the 2-year personal injury statute, which is wholly consistent with *Wilson* v. *Garcia* and with the general purposes of statutes of repose, will not frustrate any federal law or result in inequity to the workers who are charged with knowledge that it was an unsettled question as to how far back from the date of filing their complaint the damages period would

---

[8] In the *Smith* case, the Third Circuit applied our three-part test in *Chevron*, in concluding that *Wilson* should be applied to the case then before it. The court remarked: "We have held that where application of the law had been erratic and inconsistent, without clear precedent on which plaintiff could reasonably rely in waiting to file suit, a subsequent Supreme Court decision on the applicable limitations period cannot be said to have overruled clear past precedent on which the litigants may have relied." 764 F. 2d, at 194–195. The court went on to note that at the time plaintiffs in that case filed suit, the Third Circuit had not ruled definitively on which limitations period applied to the particular § 1983 claim at issue there.

reach. Accordingly, the Court of Appeals properly applied the 2-year statute of limitations to the present case.[9]

## II

This case was tried for 32 days in 1980. One-hundred fifty-seven witnesses testified and over 2,000 exhibits were introduced. On February 13, 1984, the District Court filed its findings and conclusions. In an introductory section discussing the relevant legal principles, the trial judge discussed, among other things, the nature of "disparate treatment" and "disparate impact" cases under Title VII, recognizing that in the former the plaintiff must prove not only disparate treatment, but trace its cause to intentional racial discrimination, an unnecessary element in disparate-impact cases. The District Court also emphasized that proof of discriminatory intent is crucial in § 1981 cases and that such intent cannot be made out by showing only facially neutral conduct that burdens one race more than another.

The District Court proceeded to find that the company had violated Title VII in several significant respects, including the discharge of employees during their probationary period, the toleration of racial harassment by employees, initial job assignments, promotions, and decisions on incentive pay. The court also found that in these identical ways the company had also violated § 1981, a finding the court could not have made without concluding that the company had intentionally discriminated on a racial basis in these respects.

Similarly, the Unions were found to have discriminated on racial grounds in violation of both Title VII and § 1981 in certain ways: failing to challenge discriminatory discharges of probationary employees; failure and refusal to assert racial

---

[9] The Court of Appeals recognized that giving retroactive effect to its statute of limitations holding would require reexamination of some of the liability determinations by the District Court in light of the shorter limitations period.

discrimination as a ground for grievances; and toleration and tacit encouragement of racial harassment.

What the conduct of the Unions had been and whether they had treated blacks and whites differently were questions of historical fact that Federal Rule of Civil Procedure 52(a) enjoins appellate courts to accept unless clearly erroneous. So is the issue of whether the Unions intended to discriminate based on race. *Anderson* v. *Bessemer City*, 470 U. S. 564, 574 (1985); *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287–288 (1982). The Court of Appeals did not set aside any of the District Court's findings of fact that are relevant to this case. That is the way the case comes to us, and both courts below having agreed on the facts, we are not inclined to examine the record for ourselves absent some extraordinary reason for undertaking this task. Nothing the Unions have submitted indicates that we should do so. "A court of law, such as this Court is, rather than a court for correction of errors in factfinding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275 (1949). See also *United States* v. *Ceccolini*, 435 U. S. 268, 273 (1978). Unless there are one or more errors of law inhering in the judgment below, as the Unions claim there are, we should affirm it.

The Unions contend that the judgment against them rests on the erroneous legal premise that Title VII and § 1981 are violated if a union passively sits by and does not affirmatively oppose the employer's racially discriminatory employment practices. It is true that the District Court declared that mere union passivity in the face of employer discrimination renders the union liable under Title VII and, if racial animus is properly inferrable, under § 1981 as well."[10] We need not

---

[10] The first part of this statement must have been addressed to disparate impact, for discriminatory motive is required in disparate-treatment Title VII cases as it is in § 1981 claims. See *Teamsters* v. *United States*, 431 U. S. 324, 335–336, n. 15 (1977); *General Building Contractors Assn.*,

discuss this rather abstract observation, for the court went on to say that the evidence proves "far more" than mere passivity.[11] As found by the court, the facts were that since 1965, the collective-bargaining contract contained an express clause binding both the employer and the Unions not to discriminate on racial grounds; that the employer was discriminating against blacks in discharging probationary employees, which the Unions were aware of but refused to do anything about by way of filing proffered grievances or otherwise; that the Unions had ignored grievances based on instances of harassment which were indisputably racial in nature; and that the Unions had regularly refused to include assertions of racial discrimination in grievances that also asserted other contract violations.[12]

In affirming the District Court's findings against the Unions, the Court of Appeals also appeared to hold that the

---

*Inc.* v. *Pennsylvania,* 458 U. S. 375, 391 (1982). Because the District Court eventually found that in each respect the Unions violated both Title VII and § 1981 in exactly the same way, liability did not rest on a claim under Title VII that did not rest on intentional discrimination.

[11] The District Court commented that there was substantial evidence, related to events occurring prior to the statute of limitations period, which "casts serious doubt on the unions' total commitment to racial equality." 580 F. Supp. 1114, 1157 (ED Pa. 1984). The District Court noted that it was the company, not the Unions, which pressed for a nondiscrimination clause in the collective-bargaining agreement. The District Court found that the Unions never took any action over the segregated locker facilities at Lukens and did not complain over other discriminatory practices by the company. The District Court found that when one employee approached the president of one of the local unions to complain about the segregated locker facilities in 1962, the president dissuaded him from complaining to the appropriate state agency. The District Court, however, found "inconclusive" the evidence offered in support of the employees' claim that the Unions' discriminated against blacks in their overall handling of grievances under the collective-bargaining agreement.

[12] The District Court also found that although the Unions had objected to the company's use of certain tests, they had never done so on racial grounds, even though they "were certainly chargeable with knowledge that many of the tests" had a racially disparate impact. *Id.,* at 1159.

Unions had an affirmative duty to combat employer discrimination in the workplace. 777 F. 2d, at 126–127. But it, too, held that the case against the Unions was much stronger than one of mere acquiescence in that the Unions deliberately chose not to assert claims of racial discrimination by the employer. It was the Court of Appeals' view that these intentional and knowing refusals discriminated against the victims who were entitled to have their grievances heard.

The Unions submit that the only basis for any liability in this case under Title VII is § 703(c)(3), which provides that a Union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section," 78 Stat. 256, 42 U. S. C. § 2000e–2(c)(3), and that nothing the District Court found and the Court of Appeals accepted justifies liability under this prohibition. We need not differ with the Unions on the reach of § 703(c)(3), for § 703(c)(1) makes it an unlawful practice for a Union to "exclude or to expel from its membership, *or otherwise to discriminate against,* any individual because of his race, color, religion, sex, or national origin." 78 Stat. 255, 42 U. S. C. § 2000–2(c)(1). (Emphasis added.) Both courts below found that the Unions had indeed discriminated on the basis of race by the way in which they represented the workers, and the Court of Appeals expressly held that "[t]he deliberate choice not to process grievances also violated § 703(c)(1) of Title VII." 777 F. 2d, at 127. The plain language of the statute supports this conclusion.

The Court of Appeals is also faulted for stating that the Unions had violated their duty of fair representation, which the Unions assert has no relevance to this case. But we do not understand the Court of Appeals to have rested its affirmance on this ground, for as indicated above, it held that the Unions had violated § 703.

The Unions insist that it was error to hold them liable for not including racial discrimination claims in grievances claiming other violations of the contract. The Unions followed

this practice, it was urged, because these grievances could be resolved without making racial allegations and because the employer would "get its back up" if racial bias was charged, thereby making it much more difficult to prevail. The trial judge, although initially impressed by this seemingly neutral reason for failing to press race discrimination claims, ultimately found the explanation "unacceptable" because the Unions also ignored grievances which involved racial harassment violating the contract covenant against racial discrimination but which did not also violate another provision. The judge also noted that the Unions had refused to complain about racially based terminations of probationary employees, even though the express undertaking not to discriminate protected this group of employees, as well as others, and even though, as the District Court found, the Unions knew that blacks were being discharged at a disproportionately higher rate than whites. In the judgment of the District Court, the virtual failure by the Unions to file any race-bias grievances until after this lawsuit started, knowing that the employer was practicing what the contract prevented, rendered the Unions' explanation for their conduct unconvincing.[18]

As we understand it, there was no suggestion below that the Unions held any racial animus against or denigrated blacks generally. Rather, it was held that a collective-bargaining agent could not, without violating Title VII and

---

[18] The District Court also rejected the Unions' argument that much of the workers' case involved discrimination by the company in making initial job assignments, and that it had no control over those assignments. The court found that once hired, new employees were entitled to the protection of the collective-bargaining agreement, including the protection afforded by the nondiscrimination clause:

"To require blacks to continue to work in lower paying and less desirable jobs, in units disparately black, is to discriminate against them in violation of the collective bargaining agreement (and, of course, also in violation of Title VII). It is very clear, on the record in this case, that the defendant unions never sought to avail themselves of this rather obvious mechanism for protecting the interests of their members." 580 F. Supp., at 1160.

§ 1981, follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks. The Unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing thousands of other legitimate grievances, ignored racial discrimination claims on behalf of blacks, knowing that the employer was discriminating in violation of the contract. Such conduct, the courts below concluded, intentionally discriminated against blacks seeking a remedy for disparate treatment based on their race and violated both Title VII and § 1981. As the District Court said: "A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title [VII] and § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities." 580 F. Supp., at 1160.

The courts below, in our view, properly construed and applied Title VII and § 1981. Those provisions do not permit a union to refuse to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances. It is no less violative of these laws for a union to pursue a policy of rejecting disparate-treatment grievances presented by blacks solely because the claims assert racial bias and would be very troublesome to process.

In both Nos. 85–1626 and 85–2010, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

I join Part II of the Court's opinion, affirming the Court of Appeals' decision that the Unions engaged in race discrimina-

tion in violation of 42 U. S. C. § 1981 and Title VII of the Civil Rights Act of 1964. I dissent, however, from Part I, which characterizes all § 1981 actions as tort actions, and holds that they are subject to state statutes of limitations for personal injury. Section 1981, in its original conception and its current application, is primarily a proscription of race discrimination in the execution, administration, and enforcement of contracts. Our analysis in *Wilson* v. *Garcia*, 471 U. S. 261 (1985), requires us to hold, therefore, that § 1981 actions are governed by state statutes of limitations for interference with contractual relations.

## I

In *Wilson*, the Court had to determine the most appropriate statute of limitations to apply to claims brought under § 1 of the Civil Rights Act of 1871, now codified at 42 U. S. C. § 1983. First, the Court decided that characterization of a § 1983 action, for the purpose of selecting a state statute of limitations, was a matter of federal law. 471 U. S., at 268–271. The Court then held that the federal interest in "uniformity, certainty, and the minimization of unnecessary litigation" required that all § 1983 actions receive a single broad characterization for statute-of-limitations purposes. *Id.*, at 275. For reasons identical to those stated in *Wilson*, the Court today concludes that § 1981, like § 1983, must receive a single broad characterization for statute-of-limitations purposes. I agree. The Court goes on to hold, however, that claims brought under §§ 1983 and 1981 should receive the *same* characterization, and here I part company with the Court.

In *Wilson*, the Court relied on the history of § 1983 in its determination that claims under the statute were best characterized as tort actions for damages resulting from personal injury. The Court observed that § 1983, originally known as the Ku Klux Act, was enacted as part of the Civil Rights Act of 1871, and that the "specific historical catalyst" for § 1983

was "the campaign of violence and deception in the South, fomented by the Ku Klux Klan." *Id.*, at 276. The Court highlighted the legislative history of § 1983, which made clear that Congress was attempting to stop a wave of murders, lynchings, and whippings and to eliminate "the refuge that local authorities extended to the authors of these outrageous incidents." *Ibid.* From this, the Court concluded that "[t]he atrocities that concerned Congress in 1871 plainly sounded in tort." *Id.*, at 277. More specifically, the Court determined that, among the many types of tort claims filed under § 1983, the "action for the recovery of damages for personal injuries" was the most analogous common-law cause of action. *Id.*, at 276.

Performing a like historical analysis of § 1981, I conclude that it should be characterized as an action for recovery of damages for interference with contractual relations. Section 1981, originally enacted as § 1 of the Civil Rights Act of 1866,[1] presently provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Clearly, the "full and equal benefit" and "punishment" clauses guarantee numerous rights other than equal treatment in the execution, administration, and the enforcement of contracts. In this sense § 1981, like § 1983, is broadly concerned with "the equal status of every *'person.'*" *Wilson,* *supra,* at 277 (emphasis in original). But § 1981 was primar-

---

[1] It was reenacted, with minor changes, as § 16 of the Act of May 31, 1870, 16 Stat. 144, and was recodified in 1874. See *Runyon* v. *McCrary,* 427 U. S. 160, 168–169, n. 8 (1976).

ily intended, and has been most frequently utilized, to remedy injury to a narrower category of contractual or economic rights.

The main targets of the Civil Rights Act of 1866 were the "Black Codes," enacted in Southern States after the Thirteenth Amendment was passed.[2] Congress correctly perceived that the Black Codes were in fact poorly disguised substitutes for slavery:

> "They defined racial status; forbade blacks from pursuing certain occupations or professions (e. g. skilled artisans, merchants, physicians, preaching without a license); forbade owning firearms or other weapons; controlled the movement of blacks by systems of passes;

---

[2] See B. Schwartz, From Confederation to Nation: The American Constitution 1835–1877, p. 191 (1973) ("The purpose of the act as explained by Lyman Trumbull, chairman of the Senate Judiciary Committee, in his address introducing the proposed legislation, was to carry into effect the Thirteenth Amendment by destroying the discrimination against the Negro that existed in the laws of the southern states, particularly the Black Codes enacted since emancipation"); id., at 193 ("Before the Thirteenth Amendment, slaves could not own property, and after emancipation the southern states enacted Black Codes to perpetuate this disability. This was the 'incident of slavery' which the 1866 statute was aimed at, relying for its enforcement on the Thirteenth Amendment"); 6 C. Fairman, History of the Supreme Court of the United States: Reconstruction and Reunion, 1864–1888, p. 110 (1971) ("Eight Southern legislatures were in session at some time in December 1865. Each addressed itself to the status of the Negro. . . . The Southern States had spoken, and the impact was felt in Congress from the moment it assembled. In a major aspect, the problem was economic"); K. Stampp, The Era of Reconstruction 1865–1877, p. 123 (1965) ("This condition of economic helplessness . . . enabled the white landholders, with the aid of the Black Codes, to re-establish bondage in another form. The congressional Committee on Reconstruction heard a great deal of convincing testimony about the use of southern vagrancy laws and various extra-legal coercive devices to force Negroes back into agricultural labor under strict discipline. This testimony suggested that there was a close relationship between the securing of civil and political rights on the one hand and the establishment of economic independence on the other").

required proof of residence; prohibited the congregation of groups of blacks; restricted blacks from residing in certain areas; and specified an etiquette of deference to whites, as, for example, by prohibiting blacks from directing insulting words at whites." H. Hyman & W. Wiecek, Equal Justice Under Law 319 (1982).[3]

In addition, the "formidable hand of custom," *id.*, at 321, interposed itself between blacks and economic independence, forcing Congress to move against private, as well as state-sanctioned economic discrimination. See generally *Runyon* v. *McCrary*, 427 U. S. 160 (1976); Kohl, The Civil Rights Act of 1866, Its Hour Come Round At Last: *Jones* v. *Alfred H. Mayer Co.*, 55 Va. L. Rev. 272, 279 (1969).[4]

Obviously, both the Black Codes and longstanding custom imposed a number of discriminatory prohibitions that were noneconomic, and the 39th Congress therefore had significant

---

[3] The Black Codes had "attenuated counterparts" in some Northern States, usually "prohibiting the ingress of blacks into the state, imposing Jim Crow in public facilities, or prohibiting blacks from voting." H. Hyman & W. Wiecek, Equal Justice Under Law 320 (1982).

[4] It has been pointed out that "the Black Codes told only part of the story" of the attempt to prevent blacks from controlling their own labor. Kohl, The Civil Rights Act of 1866, Its Hour Come Round At Last: *Jones* v. *Alfred H. Mayer Co.*, 55 Va. L. Rev. 272, 279 (1969). The Joint Committee on Reconstruction heard testimony demonstrating that, even apart from the restrictions of formal law, black access to land and labor markets was in practice severely limited, that physical compulsion was used to force freedmen to sign employment contracts at low rates, that cartels of white plantation owners fixed the wages of black workers by agreement, and that whites refused to sell land to blacks. See *id.*, at 279–283; see also Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 24 (1865) ("The opposition to the negro's controlling his own labor, carrying on business independently on his own account—in one word, working for his own benefit—showed itself in a variety of ways"). Section 1981 banned racial discrimination in contractual relations, whether individuals were expressly or constructively denied the right to contract because of race, or were provided a lesser opportunity than others, in the form of less favorable contract terms or unequal treatment, discouraging entry into contractual relations.

concerns that lay outside the economic realm.   Nonetheless, as the Court has often acknowledged,[5] the Legislature's *central* concerns in 1866 revolved around actions taken by the States and by private parties which consigned black Americans to lives of perpetual economic subservience to their former masters.   These concerns were often denominated "civil rights" because, in the mid-19th century, "civil rights were commonly defined, especially by lawyers, as primarily economic."   Hyman & Wiecek, *supra*, at 299.[6]

Congress clearly believed that freedom would be empty for black men and women if they were not also assured an equal opportunity to engage in business, to work, and to bargain for sale of their labor.   In the debates, it emerged time and again that Congress sought to identify and guarantee those rights that would enable a person to sustain an independent economic unit (a family) once the master-slave relation had been dismantled:

---

[5] See *General Building Contractors Assn.* v. *Pennsylvania,* 458 U. S. 375, 386 (1982) ("The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen"); *Runyon,* 427 U. S., at 172 (racial discrimination in the making and enforcement of contracts for education is a "classic violation of § 1981"); *McDonald* v. *Santa Fe Trail Transportation Co.,* 427 U. S. 273, 295 (1976) (Section 1981 prohibits "discrimination in the making or enforcement of contracts"); *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 459 (1975) (Section 1981 "on its face relates primarily to racial discrimination in the making and enforcement of contracts"); cf. *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 443 (1968) (the rights protected by 42 U. S. C. § 1982 would be mere "paper guarantee[s]" if Congress could not "assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man").

[6] See also Hyman & Wiecek, *supra,* at 300 ("There were many civil rights.   How many, no one knew, although lawyers tended to classify them neatly in terms of primarily economic, contract relationships"); *id.,* at 301 ("The right Americans . . . enjoyed[,] the opportunity to enter into almost limitless civil relationships, and to gain or lose from these involvements was considered a precious right.   This right underlay what Republicans meant by free labor").

"[Section 1981's] object is to secure to a poor, weak class of laborers the right to make contracts for their labor, the power to enforce the payment of their wages, and the means of holding and enjoying the proceeds of their toil." Cong. Globe, 39th Cong., 1st Sess., 1159 (1866) (Rep. Windom).

"It is idle to say that a citizen shall have the right to life, yet to deny him the right to labor, whereby he alone can live. It is a mockery to say that a citizen may have a right to live, and yet deny him the right to make a contract to secure the privilege and the rewards of labor. It is worse than mockery to say that men may be clothed by the national authority with the character of citizens, yet may be stripped by State authority of the means by which citizens may exist." *Id.*, at 1833 (Rep. Lawrence).[7]

---

[7] There are many passages to similar effect. See Cong. Globe, 39th Cong., 1st Sess., 1151 (1866) (Rep. Thayer):

"Sir, if it is competent for the new-formed Legislatures of the rebel States to enact laws which oppress this large class of people who are dependent for protection upon the United States Government, to retain them still in a state of real servitude; if it is practicable for these Legislatures to pass laws and enforce laws which reduce this class of people to the condition of bondmen; laws which prevent the enjoyment of the fundamental rights of citizenship; laws which declare, for example, that they shall not have the privilege of purchasing a home for themselves and their families; laws which impair their ability to make contracts for labor in such manner as virtually to deprive them of the power of making such contracts, and which then declare them vagrants because they have no homes and because they have no employment; I say, if it is competent for these Legislatures to pass and enforce such laws, then I demand to know, of what practical value is the amendment abolishing slavery in the United States?"

See also *id.*, at 1160 (Rep. Windom):

"[Blacks] are denied a home in which to shelter their families, prohibited from carrying on any independent business, and then arrested and sold as vagrants because they have no homes and no business.

"Planters combine together to compel them to work for such wages as their former masters may dictate, and deny them the privilege of hiring to any one without the consent of the master; and in order to make it impossi-

The historical origins of § 1981 therefore demonstrate its dominant concern with economic rights. The preeminence of this concern is even clearer if one looks at § 1981 in conjunction with 42 U. S. C. § 1982, which was simultaneously enacted. The plain language of § 1982 speaks squarely and exclusively to economic rights and relations. It provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Both §§ 1981 and 1982 were derived from § 1 of the Civil Rights Act of 1866; their wording and their identical legislative history have led the Court to construe them similarly. See *Runyon*, 427 U. S., at 171–173; *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431, 440 (1973).[8] Looking at §§ 1981 and 1982 in tandem, it is apparent that the primary thrust of the 1866 Congress was the provision of equal rights and treatment in the matrix of contractual and quasi-contractual relationships that form the economic sphere.

The Court maintains that § 1981 must be characterized as a personal injury action because it is "part of a federal law barring racial discrimination," which is "a fundamental injury to

---

ble for them to seek employment elsewhere, the pass system is still enforced. . . . Do you call that man free who cannot choose his own employer, or name the wages for which he will work? Do you call him a freeman who is denied the most sacred of all possessions, a home? Is he free who cannot bring a suit in court for the defense of his rights? Sir, if this be liberty, may none ever know what slavery is."

[8] The Court has previously acknowledged and relied upon the differing legislative histories and purposes of §§ 1981 and 1982 on the one hand, and § 1983 on the other, to demonstrate that the statutes should receive differing interpretations. See *District of Columbia* v. *Carter*, 409 U. S. 418 (1973) (holding that the District of Columbia is not a "State or Territory" under § 1983, although it is under § 1982). Cf. *Monroe* v. *Pape*, 365 U. S. 167, 205–206 (1961) (Frankfurter, J., dissenting in part) ("Different problems of statutory meaning are presented by two enactments deriving from different constitutional sources").

the individual rights of a person." *Ante*, at 661. If this reasoning is the real basis of *Wilson*, its historical analysis was completely superfluous. Any act of racism doubtless inflicts personal injury. At its core, it is an act of violence—a denial of another's right to equal dignity.[9] In many contexts, therefore, racially discriminatory acts are violations of federal civil rights laws. But the availability of a federal forum should not obscure the fact that the *type* of injury inflicted by discrimination will vary. Discrimination may overlap with almost all categories of legal claims, but does not wholly embrace any one. An assault, a breach of contract, an infliction of emotional distress, an unjust discharge, a refusal to hire or promote—all may be motivated by racial discrimination, but they are not for that reason the same *type* of legal claim. Bringing a claim under a civil rights Act should not alter this fact. Our analysis in *Wilson* requires us to differentiate between race discrimination that results in a tort and race discrimination that interferes with contractual relations.[10]

---

[9] The tortious aspect of racial discrimination has been noted by the Court in *Curtis* v. *Loether*, 415 U. S. 189, 196, n. 10 (1974) (citing C. Gregory & H. Kalven, Cases and Materials on Torts 961 (2d ed. 1969)), in which JUSTICE MARSHALL suggested that racial discrimination might eventually be treated as a "dignitary tort."

[10] The Court appears to argue that because "§ 1983 would reach state action that encroaches on the rights protected by § 1981," *ante*, at 661, it is important that they have the same statute of limitations. As Judge Garth demonstrated below, this argument is without merit:

"It is true that the same nucleus of operative fact sometimes could be characterized as either a § 1981 and/or § 1983 claim and thereby receive different limitations treatment if [a different statute were] applied under § 1981. Such variations, however, are commonplace in the law. In a run-of-the-mill automobile accident case, for example, identical facts could give rise to warranty claims sounding in contract and strict liability claims sounding in tort—each to be governed by a different statute of limitations. This is not thought to be a 'bizarre result,' and the possibility that the same or similar facts could support causes of action under different Civil Rights statutes is no more 'bizarre.'" 777 F. 2d 113, 136 (CA3 1985).

This Court has acknowledged the central theme of § 1981: "the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 295 (1976). We should recognize this primary historical concern again today and, as *Wilson* requires, reflect it in our choice of the appropriate state statute of limitations for § 1981 claims.

## II

Even aside from its inconsistency with the intent of the 39th Congress, the application of the state statute of limitations for personal injury to § 1981 actions is the wrong choice as a practical matter. An overwhelming number of § 1981 actions concern enforcement of economic rights. See Comment, Developments in the Law—Section 1981, 15 Harv. Civ. Rights-Civ. Lib. L. Rev. 29, 34 (1980) ("Plaintiffs in section 1981 suits have relied predominantly on the statute's guarantee of the right to contract free from racial discrimination"); see also Brief for Petitioners in No. 85–1626, pp. 18–19. It is well known that States apply different, usually longer limitations periods to contractual claims than to those sounding in tort.[11] Personal injury actions are often based upon a single, dramatic event, and depend upon evidence of physical injury or eyewitness testimony that becomes less accessible and less trustworthy with the passage of time. In contrast, contract actions or injury to economic relations may involve an extended relationship between parties and may be supported by documentary evidence. See, *e. g.*, Comment, 15 Harv. Civ.

---

[11] A longer statute of limitations might actually reduce federal litigation. Cases arising under the Fair Housing Act of 1968, 42 U. S. C. § 3601 *et seq.* (1982 ed. and Supp. III), and Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, are likely to overlap with § 1981 claims. If a short limitations period is imposed, plaintiffs in such cases will be forced to file their suits before exhausting administrative remedies, for fear of running out of time.

Rights-Civ. Lib. L. Rev., *supra*, at 225, 228. Obviously, a breach of contract or a refusal to contract resulting from race discrimination can occur in one traumatic moment, but, as a general rule, state legislatures have concluded that contract actions frequently have an evidentiary foundation with a greater life expectancy, and thus warrant a longer limitations period.[12]

The Court has said that "the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting

---

[12] See *Wilson* v. *Garcia*, 471 U. S. 261, 282 (1985) (O'CONNOR, J., dissenting) ("[A] legislature's selection of differing limitations periods for a claim sounding in defamation and one based on a written contract is grounded in its evaluation of the characteristics of those claims relevant to the realistic life expectancy of the evidence and the adversary's reasonable expectations of repose"); 777 F. 2d, at 138 (statement of Judge Garth sur petition for rehearing) ("Most states have concluded that economically grounded causes of action will more frequently arise from patterned and well-documented courses of conduct than will claims for personal injury . . . . There is no reason we should not respect these policy choices, grounded as they are in real and substantial differences between and among causes of action, in applying civil rights statutes which reflect the same differences"); *Meyers* v. *Pennypack Woods Home Ownership Assn.*, 559 F. 2d 894, 903, n. 26 (CA3 1977) (quoting *Dudley* v. *Textron, Inc., Burkart-Randall Division*, 386 F. Supp. 602, 606 (ED Pa. 1975) (Section 1981 and 1982 cases normally involve "'patterned-type behavior, frequently involving documentary proof'"; accordingly, "'[t]he passage of time is less likely to impede the proof of facts'")); *Dupree* v. *Hertz Corp.*, 419 F. Supp. 764, 767 (ED Pa. 1976) ("[T]he passage of time is not as likely to interfere with the proof of an employment discrimination case as it would affect the memories of witnesses in a personal injury action"); *Dudley* v. *Textron, Inc., supra*, at 606 ("[Section] 1983 actions have typically involved tort claims arising from personal injury, in many cases involving physical conduct of an irregular or sudden nature. By contrast, claims made pursuant to § 1981 usually arise out of employment contract relationships which consist of more patterned-type behavior, frequently involving documentary proof in the form of employment records. Accordingly, the passage of time is less likely to impede the proof of facts in a § 1981, than in a § 1983, case and a longer statute of limitations under § 1981 is, therefore, more appropriate").

valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 463–464 (1975). Today we have required States to apply in contract cases a "value judgment" reached with regard to torts. Inevitably, the statute of limitations henceforth used in § 1981 cases will be wrong most of the time.[13]

## III

It may well be that "it is the fate of contract to be swallowed up by tort (or for both of them to be swallowed up in a generalized theory of civil obligation)," G. Gilmore, The Death of Contract 94 (1974), but it has not happened yet. The general obligation to treat all persons with equal dignity undeniably prohibits discrimination based on race. Yet that obligation is still imposed in a legal system that classifies obligations, a system that distinguishes between obligations based on contract and those based on the reasonable person's duty of care. Section 1981 actions were primarily intended to, and most often do, vindicate claims which related to contractual rights, and we should apply a state statute of limitations governing contractual relations to them. I respectfully dissent.

JUSTICE POWELL, with whom JUSTICE SCALIA joins, and with whom JUSTICE O'CONNOR joins as to Parts I through IV, concurring in part and dissenting in part.

I concur in the Court's holding that the state statute of limitations for personal injury actions should apply to claims arising under 42 U. S. C. § 1981. I also agree that the Court's ruling on the statute of limitations question should

---

[13] Pennsylvania formerly applied a 6-year statute of limitations to contract actions. Pa. Stat. Ann., Tit. 42, § 5527 (Purdon 1981). This statute has generally been applied to § 1981 actions arising in Pennsylvania "where the gist of the cause of action is economic rather than bodily injury caused by interference with the employment rights of black workers," 777 F. 2d, at 131 (Garth, J., dissenting), and I would apply it here.

apply to the parties in this case and therefore join Part I of the Court's opinion. I dissent, however, from Part II of the Court's opinion, that affirms the judgment against the Unions for violating § 1981 and Title VII of the Civil Rights Act of 1964. The ambiguous findings of the District Court, accepted by the Court of Appeals for the Third Circuit, do not provide adequate support for the Court's conclusion that the Unions engaged in intentional discrimination against black members. Neither of the courts below specifically found that the Unions were motivated by racial animus, or that they are liable to black members under the alternative Title VII theory of disparate impact. Accordingly, I would remand to permit the District Court to clarify its findings of fact and to make additional findings if necessary.

## I

Close examination of the findings of the District Court is essential to a proper understanding of this case. The plaintiffs, blacks employed by the Lukens Steel Company, sued the United Steelworkers of America and two of its local unions (Unions) for alleged violations of § 1981 and Title VII. The plaintiffs' allegations were directed primarily at the Unions' handling of grievances on behalf of black members. The District Court found that "[t]he steady increase in grievance filings each year has not produced a corresponding increase in the capacity of the grievance-processing system to handle complaints." 580 F. Supp. 1114, 1158 (ED Pa. 1984). Consequently, the court found, the Unions gave priority to "[s]erious grievances"—that is, "those involving more than a four-day suspension, and those involving discharges." *Ibid.* In an effort to reduce the backlog of grievances, the Unions disposed of many less serious grievances by simply withdrawing them and reserving the right to seek relief in a later grievance proceeding. The District Court found "no hard evidence to support an inference that these inadequacies disadvantage blacks to a greater extent than whites." *Ibid.*

The incomplete evidence in the record suggests that the percentage of grievances filed on behalf of black employees was proportional to the number of blacks in the work force. *Ibid.* Of the relatively few grievances that proceeded all the way to arbitration, the District Court found that the number asserted on behalf of black members was proportional to the number of blacks in the work force. *Ibid.* Moreover, black members had a slightly higher rate of success in arbitration than white members. *Id.*, at 1158–1159. In sum, the District Court found that "plaintiffs' generalized evidence concerning perceptions about racial inequities in the handling of grievances does not, without more, establish a prima facie case . . . ."[1] *Id.*, at 1159.

The District Court concluded, however, that the plaintiffs were "on firmer ground" in challenging the Unions' "repeated failures, during the limitations period, to include racial discrimination as a basis for grievances or other complaints against the company." *Ibid.* Beginning in 1965, the Unions' collective-bargaining agreements with the employer prohibited discrimination on the basis of race against any employee, permanent or probationary. It is undisputed that the Unions "were reluctant to assert racial discrimination as a basis for a grievance." *Ibid.* The court found the Unions' explanation for this reluctance facially reasonable. *Ibid.* The Unions observed that employees were more likely to obtain relief if a grievance based on racial discrimination was framed as a violation of another provision of the collective-bargaining agreement that did not require proof of racial animus. Moreover, when faced with an allegation of racial dis-

---

[1] The District Court found that black union members "actively participated" in union meetings and affairs. 580 F. Supp., at 1157. A black member served as chairman of the grievance committee, and other black members served on the committee. Brief for Petitioners in No. 85–2010, p. 7; 2 App. 714–715. The percentage of black shop stewards, the Unions' primary representatives in the grievance process, frequently exceeded the percentage of black members in the bargaining unit. Brief for Petitioners in No. 85–2010, p. 7; 2 App. 634–640.

crimination, "the company tended 'to get its back up' and resist [the] charge." *Ibid.* The court nevertheless rejected the Unions' explanation, for two reasons. First, the court found that the Unions "virtually ignored" the "numerous instances of harassment, which were indisputably racial in nature, but which did not otherwise plainly violate a provision of the collective bargaining agreement." *Id.*, at 1160. Second, the court concluded that "vigorous pursuit of claims of racial discrimination would have focused attention upon racial issues and compelled some change in racial attitudes," and that the Unions' "unwillingness to assert racial discrimination claims as such rendered the non-discrimination clause in the collective bargaining agreement a dead letter." *Ibid.*

The District Court also found that the Unions had adopted a policy of refusing to process any grievances on behalf of probationary employees, despite the fact that the collective-bargaining agreement prohibited employers from discriminating against any employee, permanent or probationary, on the basis of race. The Unions adhered to this policy, the court found, even though they "knew that blacks were being discharged . . . at a disproportionately higher rate than whites." *Id.*, at 1159. Finally, the court found that the Unions failed to object to written tests administered by the employer on the ground that it had a disparate impact on black members, even though they "were certainly chargeable with knowledge that many of the tests . . . were notorious in that regard." *Ibid.* The court found, however, that the Unions objected to "tests of all kinds," on the ground that they gave an unfair advantage to younger employees who had recently completed their formal education. *Ibid.*

The Court of Appeals accepted each of the District Court's findings of fact and affirmed the judgment against the Unions. 777 F. 2d 113 (CA3 1985). The appellate court concluded that the Unions' "deliberate choice not to process grievances" violated Title VII "because it discriminated against the victims who were entitled to representation."

*Id.*, at 127. The Court of Appeals also concluded that "[t]he district court's finding of intentional discrimination properly supports the claims under § 1981 as well." *Ibid.*

## II

### A

As the Court recognizes, plaintiffs can recover under § 1981 only for intentional discrimination. *Ante*, at 665–666, n. 10; *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 382–391 (1982). The Court also recognizes that a valid claim under Title VII must be grounded on proof of disparate treatment or disparate impact. *Ante*, at 664. A disparate-treatment claim, like a § 1981 claim, requires proof of a discriminatory purpose. *Teamsters* v. *United States*, 431 U. S. 324, 335–336, n. 15 (1977). Of course, "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279 (1979) (citation omitted). It implies that the challenged action was taken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Ibid.* (footnote omitted). The Court concedes that "there was no suggestion below that the Unions held any racial animus against or denigrated blacks generally." *Ante*, at 668. It nevertheless concludes that the Unions violated Title VII and § 1981 because they "refuse[d] to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances," *ante*, at 669, and "pursue[d] a policy of rejecting disparate-treatment grievances presented by blacks solely because the claims assert racial bias and would be very troublesome to process," *ibid.* In my view, this description of the Union's conduct, and thus the Court's legal conclusion, simply does not fit the facts found by the District Court.

The Unions offered a nondiscriminatory reason for their practice of withdrawing grievances that did not involve a dis-

charge or lengthy suspension. According to the Unions, this policy, that is racially neutral on its face, was motivated by the Unions' nondiscriminatory interest in using the inadequate grievance system to assist members who faced the most serious economic harm. The District Court made no finding that the Unions' explanation was a pretext for racial discrimination. The Unions' policy against pursuing grievances on behalf of probationary employees also permitted the Unions to focus their attention on members with the most to lose. Similarly, the Unions' stated purpose for processing racial grievances on nonracial grounds—to obtain the swiftest and most complete relief possible for the claimant, see 580 F. Supp., at 1159—was not racially invidious. The Unions opposed the use of tests that had a disparate impact on black members, although not on that ground. Their explanation was that more complete relief could be obtained by challenging the tests on nonracial grounds. 1 App. 237. The District Court made no finding that the Unions' decision to base their opposition on nonracial grounds was motivated by racial animus.[2] Absent a finding that the Unions intended to dis-

---

[2] Of course, an inference of discriminatory intent may arise from evidence of objective factors, including the inevitable or foreseeable consequences of the challenged policy or practice. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279, n. 25 (1979); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 266 (1977). But when "the impact is essentially an unavoidable consequence of a . . . policy that has in itself always been deemed to be legitimate, . . . the inference simply fails to ripen into proof." *Personnel Administrator of Mass.* v. *Feeney, supra*, at 279, n. 25.

The District Court did not expressly rely on any inference of racial animus drawn from the consequences of the Unions' grievance policies. Indeed, it appears that the District Court imposed liability for intentional discrimination without finding that the Unions acted, or failed to act, with the purpose of harming black members. The District Court's primary justification for imposing liability was that "mere union passivity in the face of employer-discrimination renders the unions liable under Title VII and, if racial animus is properly inferrable, under § 1981 as well." 580 F. Supp., at 1160 (citations omitted). It then stated:

criminate against black members, the conclusion that the Unions are liable under § 1981 or the disparate-treatment theory of Title VII is unjustified.

## B

Although the District Court stated that the plaintiffs raised both disparate-treatment and disparate-impact claims, 580 F. Supp., at 1119, it did not make specific findings nor did it conclude that the plaintiffs are entitled to recover under a disparate-impact theory. Indeed, the limited amount of statistical evidence discussed by the District Court indicates that the Unions' grievance procedures did not have a disparate impact on black members. See *supra*, at 682. Moreover, neither the District Court nor the Court of Appeals considered the validity of potential defenses to disparate-impact claims. For example, before the court properly could have held the Unions liable on a disparate-impact theory, the court should have considered whether the Unions' practices were justified by the doctrine of business — or union — necessity. See *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971). The court also should have considered arguments that some of the challenged practices, such as the Unions' refusal to pursue grievances of probationary employees, were justifiable as part of a bona fide seniority system.[3] See *Ford*

---

"Moreover, the evidence in this case proves far more than mere passivity on the part of the unions. The distinction to be observed is between a union which, through lethargy or inefficiency simply fails to perceive problems or is inattentive to their possible solution (in which case, at least arguably, the union's inaction has no connection with race) and a union which, aware of racial discrimination against some of its members, fails to protect their interests." *Ibid.*

Far from inferring racial animus from the foreseeable consequences of the Unions' inaction, the District Court merely stated its view that union passivity—whether deliberate or inadvertent—is a basis for liability without regard to the Unions' purpose or intent.

[3] Although these defenses do not appear to have been raised by the Unions in the courts below, this is not surprising in view of the fact that the plaintiffs did not present evidence or legal arguments to support a disparate-impact theory.

*Motor Co.* v. *EEOC*, 458 U. S. 219, 239–240 (1982). Because this Court is reluctant to consider alternative theories of liability not expressly passed upon by the lower courts, see *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 580–581 (1978), I would remand to the District Court to permit it to consider whether the Unions are liable under a disparate-impact theory.[4]

## III

The Court does not reach the question whether a union may be held liable under Title VII for "mere passivity" in the face of discrimination by the employer, because it agrees with the courts below that the record shows more than mere passivity on the part of the Unions. *Ante,* at 665–666. I disagree with that conclusion, and so must consider whether the judgment can be affirmed on the ground that Title VII imposes an affirmative duty on unions to combat discrimination by the employer.

The starting point for analysis of this statutory question is, as always, the language of the statute itself. *Kelly* v. *Robinson,* 479 U. S. 36, 43 (1986). Section 703(c), the provision of Title VII governing suits against unions, does not suggest that the union has a duty to take affirmative steps to remedy employer discrimination.[5] Section 703(c)(1) makes it unlawful for a union "to exclude or to expel from its membership, or otherwise to discriminate against, any individual

---

[4] An additional consideration supporting a remand is the Court's determination that a 2-year statute of limitations applies rather than the 6-year statute of limitations applied by the District Court. It is not clear whether the District Court would impose liability on the Unions based solely on their conduct after 1971. The Court of Appeals vacated the District Court's finding that racial harassment was a classwide problem because it could not determine from the record whether racial harassment after 1971 amounted to more than "a few isolated incidents." 777 F. 2d 113, 121 (CA3 1985). Moreover, there is evidence in the record that the Unions filed grievances explicitly alleging racial discrimination after 1971. 2 App. 412, 422, 491, 657, 659, 684.

[5] Section 703, 42 U. S. C. § 2000e-2(c), is set out in full *ante,* at 658–659, n. 2.

because of his race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(c)(1). This subsection parallels § 703 (a)(1), that applies to employers. See 42 U. S. C. § 2000e–2(a)(1). This parallelism, and the reference to union membership, indicate that § 703(c)(1) prohibits direct discrimination by a union against its members; it does not impose upon a union an obligation to remedy discrimination by the *employer*. Moreover, § 703(c)(3) specifically addresses the union's interaction with the employer, by outlawing efforts by the union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." § 2000e–2(c)(3). If Congress had intended to impose on unions a duty to challenge discrimination by the employer, it hardly could have chosen language more ill suited to its purpose. First, "[t]o say that the union 'causes' employer discrimination simply by allowing it is to stretch the meaning of the word beyond its limits." 1 A. Larson & L. Larson, Employment Discrimination, § 44.50, p. 9–40 (1985). Moreover, the language of § 703(c)(3) is taken *in haec verba* from § 8(b)(2) of the National Labor Relations Act (NLRA), 29 U. S. C. § 158(b)(2). That provision of the NLRA has been held not to impose liability for passive acquiescence in wrongdoing by the employer. Indeed, well before the enactment of Title VII, the Court held that even encouraging or inducing employer discrimination is not sufficient to incur liability under § 8(b)(2). *Electrical Workers* v. *NLRB*, 341 U. S. 694, 703 (1951).

In the absence of a clear statement of legislative intent, the Court has been reluctant to read Title VII to disrupt the basic policies of the labor laws. See *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 79 (1977). Unquestionably an affirmative duty to oppose employer discrimination could work such a disruption. A union, unlike an employer, is a democratically controlled institution directed by the will of its constituents, subject to the duty of fair representation. Like other representative entities, unions must balance the

competing claims of its constituents. A union must make difficult choices among goals such as eliminating racial discrimination in the workplace, removing health and safety hazards, providing better insurance and pension benefits, and increasing wages. The Court has recognized that "[t]he complete satisfaction of all who are represented is hardly to be expected." *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 338 (1953). For these reasons unions are afforded broad discretion in the handling of grievances. *Electrical Workers* v. *Foust*, 442 U. S. 42, 51 (1979); *Vaca* v. *Sipes*, 386 U. S. 171, 191–194 (1967). Union members' suits against their unions may deplete union treasuries, and may induce unions to process frivolous claims and resist fair settlement offers. *Electrical Workers* v. *Foust, supra,* at 51–52; *Vaca* v. *Sipes, supra,* at 191–193. The employee is not without a remedy, because union members may file Title VII actions directly against their employers. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). I therefore would hold that Title VII imposes on unions no affirmative duty to remedy discrimination by the employer.

## IV

I agree that the judgment in No. 85–1626 should be affirmed. For the reasons stated above, I would vacate the judgment in No. 85–2010 and remand the case for further proceedings consistent with this opinion.

JUSTICE O'CONNOR, concurring in the judgment in No. 85–1626 and dissenting in No. 85–2010.

In light of the Court's decision to apply a uniform characterization for limitations purposes to actions arising under 42 U. S. C. § 1981, I agree that the most appropriate choice is each State's limitations period for personal injury suits. But see *Wilson* v. *Garcia*, 471 U. S. 261, 280–287 (1985) (O'CONNOR, J., dissenting). Although I doubt whether the Court's decision should be given general retroactive effect, I agree that the Court should adhere to its policy of applying the rule

it announces to the parties before the Court. See *Stovall* v. *Denno*, 388 U. S. 293, 301 (1967). I therefore concur in the judgment of the Court in No. 85–1626. I join Parts I through IV of JUSTICE POWELL's opinion concurring in part and dissenting in part, as to No. 85–2010.