**Gigi F. SMITH, Plaintiff,**

v.

**CONTINENTAL INSURANCE CORPORATION, Underwriters Adjusting Company, William Coyle, Carlton Daniels, and Steve Cannon, Defendants.**

Civ. A. No. 86–195.

United States District Court,
D. New Jersey.

Sept. 25, 1990.

Gigi F. Smith, Mount Vernon, N.Y., plaintiff, pro se.

Roberts & Finger by Barry Asen and Joel Finger, New York City, for defendants.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

One of the most precious rights enjoyed by citizens of this great country is free

access to its courts. Armed only with pen and paper, aggrieved individuals may submit claims to a court that are treated with the same respect and accorded the same consideration as claims filed by several-hundred-member law firms on behalf of Fortune 500 corporations. Such access provides one who believes that he or she has been wronged with the ability to correct that wrong. It provides, as well, an effective means of exposing the most pernicious forms of discrimination and vindicating the most fundamental of constitutional rights.

Unfortunately, the deserved accolades for this liberal system of inclusion are somewhat muted by the accompanying disproportionate expenditure of judicial resources. Litigants without recourse to counsel are understandably unfamiliar with the unique practices and procedures of litigation in a particular court. Consequently, judicial personnel are frequently required to spend an inordinate amount of time deciphering and divining the intent of written submissions and, subsequently, performing the legal research necessary before determining the merit—or lack thereof—of such submissions. Such an expenditure of resources is not merely tolerated but willingly accepted in order to provide a litigant with meaningful access to the courts.

Occasionally, however, a *pro se* litigant actively abuses the judicial system. Most often, such abuse is a consequence of a litigant's preoccupation with "seeking justice" for any and all wrongs to which he or she has been subjected, regardless of whether those wrongs are real or imagined and irrespective of whether they are justiciable. The manifestations of such a preoccupation form, as here, a characteristic pattern: a raft of voluminous, poorly-drafted written submissions; a lack of cooperation with opposing counsel to the point of obstruction; the invocation of *pro se* status to obtain every possible advantage; appeal of each and every adverse judicial ruling in the belief that the judge is either biased or incompetent because of his or her inability to comprehend the "obvious" merit of the plaintiff's position; and a spewing at every opportunity of vitriol and threats.

In recent memory, no *pro se* litigant has so exercised this court as plaintiff Gigi Smith, for whom this case has become a second career. Presumably, courts in the Southern District of New York have been similarly exercised in recent years given that plaintiff has inundated that district with lawsuits against nearly 300 corporations and government agencies, all of which were dismissed. (Def. Br. at 6, 25). So, too, will this case be dismissed.

## II. PROCEDURAL HISTORY

The judicial odyssey of Gigi Smith—at least in this case—began with the filing of a complaint on January 15, 1986 against Continental Insurance Corporation ("Continental"); Underwriters Adjusting Company ("UAC"), plaintiff's former employer and a subsidiary of Continental; and three employees of UAC alleging (1) pre-termination harassment and discharge on the basis of race and sex and in retaliation for filing discrimination charges with UAC and with the Equal Employment Opportunity Commission ("EEOC"); and (2) post-termination retaliation by virtue of having been blacklisted with prospective employers, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), and the Thirteenth Amendment of the United States Constitution.

In an Opinion and Order filed October 9, 1987, this court granted summary judgment concluding that (1) plaintiff's Title VII claims were time-barred and that there were no grounds to warrant equitable tolling; (2) the Thirteenth Amendment did not afford plaintiff an independent cause of action; (3) plaintiff had expressly withdrawn her § 1981 claim alleging sex discrimination; (4) plaintiff's § 1981 claims alleging harassment and discharge were barred by New Jersey's two year personal injury statute of limitations; and (5) plaintiff had failed to establish a *prima facie* case with regard to her § 1981 claim alleging retaliation through blacklisting. This court, thereafter, denied plaintiff's motion

for reconsideration in an Opinion and Order filed March 3, 1988, and plaintiff appealed to the United States Court of Appeals for the Third Circuit.

By Opinion filed April 6, 1989, the Third Circuit affirmed the grant of summary judgment on plaintiff's Title VII claim, Thirteenth Amendment claim, and § 1981 claims alleging sex discrimination and retaliation, but reversed as to plaintiff's § 1981 claims alleging pre-termination harassment and discharge on a ground having nothing to do with the merits. The court held that although *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985) dictated that New Jersey's two year personal injury statute of limitations was the most analogous statute of limitations for § 1981 actions, it should not have been applied retroactively to bar plaintiff's cause of action under § 1981. Rather, the court concluded, New Jersey's six year statute of limitations for contract actions was the most appropriate limitations period given that plaintiff's cause of action arose in 1982 and, consequently, plaintiff's harassment and discharge claims were not time-barred. On remand, the § 1981 claims alleging pre-termination harassment and discharge were reinstated.

On June 24, 1988, while her appeal to the Third Circuit was still pending, plaintiff filed an action in the United States District Court for the Southern District of New York against Continental and UAC alleging post-termination blacklisting with prospective employers on the basis of race and sex and in retaliation for filing the action in this court, in violation of Title VII and § 1981. Because the case arose from the same operative facts and involved the same parties to this action, the Honorable John Walker transferred the case to the District of New Jersey by Order filed April 25, 1989. Thereafter, by Order filed May 23, 1989, this court consolidated the transferred case into this action for all purposes.

Plaintiff filed yet another complaint against Continental in this court on October 20, 1989 alleging refusal to hire her on August 17, 1989 because of race and in retaliation for filing this action, in violation of § 1981. Again, this court consolidated the case into this action by Order filed October 29, 1989.

Plaintiff, I note, raised yet another claim during her deposition. In response to questioning, she interpreted her complaint in this action to contain a distinct claim against defendants for failure to rehire her because of race and sex discrimination and in retaliation for filing this action, in violation of Title VII and § 1981. Despite plaintiff's failure to amend her complaint, in an exercise of caution the allegation of failure to rehire will be considered as a separate claim.

Defendants now move for summary judgment on the five outstanding claims in this case: (1) pre-termination harassment because of race and retaliation, in violation of § 1981; (2) discharge because of race and retaliation, in violation of § 1981; (3) post-termination blacklisting because of race, sex and retaliation, in violation of Title VII and § 1981; (4) refusal to hire because of race and retaliation, in violation of § 1981; and (5) refusal to rehire because of race, sex and retaliation, in violation of Title VII and § 1981. In addition, defendants seek reasonable attorney's fees pursuant to section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k). For the reasons set forth below, these motions will be granted.

### III. FACTS

Plaintiff, a black woman, was hired by UAC as a clerk typist on March 29, 1976, and was subsequently promoted to the positions of claims processor, claims investigator and, finally, liability adjuster. (Daniels Aff. at ¶ 2). She was discharged on August 12, 1982 for poor performance and unprofessional behavior which culminated in an episode on August 12th when, following a meeting to discuss her poor performance with her supervisor, defendant Carlton Daniels ("Daniels") who, I note, is also Black, she began to "curse, rant and scream," creating such a disturbance that other employees vacated the work area and screamed at another supervisor in an abusive and threatening manner. *Id.* at ¶ 3; Def. Resp. to Inter. No. 61.

For years, Continental and UAC had a policy and adhered to a practice of providing a potential employer of a former employee with information limited to that employee's salary, position and dates of employment. (Mazzarisi Aff. at ¶ 2). This policy and practice have been consistently applied to plaintiff since her date of discharge. (Daniels Aff. at ¶¶ 4–6; Mazzarisi Aff. at ¶¶ 2–6).

Only two employment-related inquiries were received by defendants with regard to plaintiff. (Mazzarisi Aff. at ¶¶ 3, 6). The first instance involved a telephone call to Daniels from a woman claiming to represent Woolworth's. (Daniels Aff. at ¶ 4). Daniels advised the caller that he could not provide the requested information and directed her to the Human Resources Department. *Id.* The Human Resources Department, however, never received an inquiry about plaintiff from a representative of Woolworth's and, thus, no employment information was provided to Woolworth's. (Mazzarisi Aff. at ¶ 4).

The only other inquiry was a written request for employment information about plaintiff from the Yonkers, New York office of the United States Postal Service received by Daniels and forwarded to Lynne Mazzarisi ("Mazzarisi"), Director of the Human Resources Department. (Daniels Aff. at ¶ 5; Mazzarisi Aff. at ¶¶ 1, 5). In a response dated September 1, 1987 on the form questionnaire which had been enclosed, Mazzarisi confirmed only plaintiff's dates of employment and job title while employed at UAC, and declined to offer any salary figure because that information had not been requested. (Mazzarisi Aff. at ¶ 5 & Exh. A). She noted at the bottom of the form that "[p]er Company policy we can release only the dates of employment and position held." *Id.* at Exh. A.

Continental and, vicariously, UAC have also had a policy in effect since at least August 12, 1982 against rehiring employees who had been discharged. *Id.* at ¶ 7; Mazzarisi Rep.Aff. at ¶ 3. Continental's Human Resources Manual explicitly states that one condition for rehiring a former employee is that "[t]he employee must have been in good standing at the time of separation." (Mazzarisi Rep.Aff. at Exh. 2).

Plaintiff submitted employment applications to Continental and UAC on four occasions since her discharge. (Mazzarisi Rep. Aff. at ¶ 4). Plaintiff's first two applications were personally considered by Joanne Mastropolo ("Mastropolo"), Manager of Human Resources for Continental. (Mastropolo Aff. at ¶¶ 1–2). In the first application dated March 30, 1988, plaintiff sought a claims adjuster position and was informed by Mastropolo in a form rejection letter dated May 1988 that there were no suitable positions available because no vacant claims adjuster positions existed in New York at the time her application was considered. *Id.* at ¶ 2 & Exhs. A, B; *see* Def. Resp. to Inter. Concerning Position Vacancies No. 1. Plaintiff again applied for employment on January 18, 1989, but failed to answer the question "What type of position are you applying for?" on the application. (Mastropolo Aff. at ¶ 3 & Exh. C). Consequently, Mastropolo sent plaintiff a similar form rejection letter on February 21, 1989. *Id.* at ¶ 3 & Exh. D. When considering these applications, Mastropolo was unaware of plaintiff's allegations of discrimination and retaliation against defendants and, consequently, such motivations played no part in the rejections. *Id.* at ¶ 4.

Likewise, neither discrimination nor retaliation was a factor in the rejection of plaintiff's third and fourth applications for employment. (Griffiths Aff. at ¶ 3). Mazzarisi personally responded to plaintiff's third application dated June 20, 1989 seeking a position as a tax clerk or a tax assistant in the Tax Department in a letter dated August 17, 1989, informing her that there were no vacant tax clerk positions or comparable positions available and that even if such vacancies existed, plaintiff could not be hired as a matter of company policy because of her prior discharge. (Mazzarisi Aff. at ¶ 8 & Exh. D; Mazzarisi Rep.Aff. at ¶ 5; Def. Resp. to Inter. Concerning Position Vacancies No. 2 & Exh. C). In response to plaintiff's final employment application dated January 9, 1990 for

a position as a tax analyst or a tax assistant in the Tax Department, Lisa Griffiths ("Griffiths"), Human Resources Employment Specialist for Continental, sent a form rejection letter on February 23, 1990 stating that there were no suitable positions available and that the Tax Department had not, since June 20, 1989, had any vacant tax clerk, tax assistant, accounting clerk or bookkeeper positions, the positions for which plaintiff was supposedly qualified. (Griffiths Aff. at ¶ 1–2; Def. Resp. to Inter. Concerning Position Vacancies No. 2). Like Mastropolo, Griffiths was unaware of plaintiff's allegations of discrimination and retaliation against defendants at the time she considered the application. *Id.* at ¶ 3.

Defendants have filled vacant claims adjuster positions with a sizeable percentage of women and representatives of minority racial groups. Since plaintiff submitted her first employment application on March 30, 1988, UAC has filled 64 claims adjuster and claims examiner positions with 33 women and with a racial spectrum of 48 Caucasians, 11 Blacks, 4 Hispanics and 1 Asian. (*See* Def. Resp. to Inter. Concerning Position Vacancies at Exh. E).

### III. DISCUSSION

 Plaintiff's § 1981 claims of pre-termination harassment and discharge are not actionable as a matter of law. The Supreme Court of the United States has circumscribed the availability of § 1981 to victims of discriminatory conduct in the workplace through its landmark decision *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The Court therein interpreted § 1981 to

protect [only] two rights: "the same right ... to make ... contracts" and "the same right ... to enforce contracts." The first of these protections extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. * * * [T]he right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation

has been established, including breach of the terms of the contract or imposition of discriminatory working conditions.

*Patterson, supra,* 491 U.S. at ——, 109 S.Ct. at 2372–73; *accord Williams v. Giant Eagle Markets,* 883 F.2d 1184, 1191 (3d Cir.1989); *Matthews v. Freedman,* 882 F.2d 83, 85 (3d Cir.1989). Plaintiff's allegation of discriminatory and retaliatory pre-termination harassment is unquestionably post-formation conduct excluded by the *Patterson* court from the purview of § 1981. *Matthews, supra,* 882 F.2d at 85. Likewise, plaintiff's claim of retaliatory and discriminatory discharge does not implicate her § 1981 right "to make" a contract. *Gonzalez v. Home Ins. Co.,* 909 F.2d 716, 722 (2d Cir.1990); *McKnight v. General Motors Corp.,* 908 F.2d 104, 108 (7th Cir.1990); *Courtney v. Canyon Television & Appliance Rental,* 899 F.2d 845, 849 (9th Cir.1990); *Lavender v. V & B Transmissions & Auto Repair,* 897 F.2d 805, 807–08 (5th Cir.1990). Consequently, these § 1981 claims must be dismissed.

Plaintiff's contention that *Patterson* should not be applied retroactively to bar these claims is unavailing. The general rule is that a federal court will apply the law that is in effect at the time of its decision. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987); *Air–Shields, Inc. v. Fullam,* 891 F.2d 63, 65 (3d Cir.1989). Although the Court of Appeals for the Third Circuit has not yet squarely addressed the issue of the retroactivity of *Patterson,* it has, consistent with this general rule, approved retroactive application *sub silentio. See Matthews, supra,* 882 F.2d at 85. Moreover, the Courts of Appeals that have considered the issue have universally ruled in favor of the retroactive application of *Patterson. See Bailey v. Northern Indiana Pub. Serv. Co.,* 910 F.2d 406, 407 (7th Cir.1990); *Gonzalez, supra,* 909 F.2d at 723; *Courtney, supra,* 899 F.2d at 849; *Lavender, supra,* 897 F.2d at 807. Indeed, retroactivity would not work inequity in this case, particularly because plaintiff did not forego a more expansive Title VII claim in reliance upon a pre-*Patterson* interpretation of § 1981. *See Lavender, supra,* 897

F.2d at 807. The *Patterson* decision governs and precludes the pre-termination harassment and discharge claims.

■ Plaintiff's post-termination discriminatory and retaliatory blacklisting claim has no merit. This court previously granted summary judgment in favor of defendants on plaintiff's blacklisting claim with regard to the alleged false and defamatory references given to the 46 prospective employers enumerated in paragraph 14(a) of plaintiff's Amended Complaint and with regard to the telephone inquiry from the Woolworth's representative, finding that "there is utterly no evidence—or even inference—that defendants defamed her rendering her unable to find employment...." Opinion filed October 9, 1987 at 8. The Third Circuit affirmed. Accordingly, as the law of the case, the grant of summary judgment on the blacklisting claim controls as to these allegations and will not be reconsidered here. *See Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir.1982); *see also Todd & Co. v. Securities and Exchange Comm'n*, 637 F.2d 154, 157 (3d Cir.1980).

The only facts relevant to plaintiff's blacklisting claim that have not previously been considered relate to defendants' response to the inquiry by the Yonkers, New York office of the United States Postal Service, a response which similarly involves no false or defamatory statements. Mazzarisi simply provided the Postal Service with plaintiff's last job title and dates of employment at UAC, noting specifically that such a restriction on information concerning former employees was required by company policy. The revelation of such innocuous facts pursuant to a uniform policy could not have created any negative impression.[1] Clearly, defendants' communication with the Postal Service provides no support for plaintiff's blacklisting claim.

It is apparent that the exclusive basis for plaintiff's claim of discriminatory and retaliatory blacklisting is rank speculation. She admits to being unaware of any negative verbal or written job references to prospective employers yet rationalizes that her lengthy search for employment could only have been a consequence of blacklisting by defendants. Plaintiff is convinced that defendants conspired to devise and implement a grand scheme designed to prevent her from ever obtaining employment which involved (1) a network of "white vigilantes" that trailed her and provided false information to prospective employers; (2) illegal wiretapping with the goal of convicting her of a trumped-up charge so that she would have a criminal record and would be rendered unemployable; (3) coercing attorneys into not representing her; (4) paying her brothers and sisters to monitor her behavior and actions; and (5) paying unnamed persons to make her look like "a woman of ill repute." Unsurprisingly, plaintiff offers no evidence to support these fantastic allegations. Because plaintiff has failed to come forward with any facts indicating that there is a genuine issue for trial, summary judgment will be granted as to her post-termination blacklisting claim. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Plaintiff's remaining claims of failure to hire and failure to rehire are separate and distinct with independent and mutually exclusive factual bases. As noted earlier, plaintiff was employed as a liability adjuster immediately prior to her discharge from UAC. Subsequently, she submitted employment applications to Continental and UAC on four separate occasions: (1) a March 30, 1988 application for a claims adjuster position which was rejected in a letter dated May 1988; (2) a January 18, 1989 application for an unspecified position which was rejected in a letter dated February 21, 1989; (3) a June 20, 1989 application for a tax clerk or tax assistant position in the Tax Department which was rejected in a letter dated August 17, 1989; and (4) a January 9, 1990 application for a tax assistant or tax analyst position in the Tax Department which was rejected in a letter dated February 23, 1990.

---

1. Plaintiff's allegation of blacklisting based upon a refusal of defendants to provide her with any reference must also fail because it is supported by utterly no evidence.

Although plaintiff has predictably neglected to delineate the factual bases of her failure to rehire claim, it is axiomatic that such a claim can encompass only her post-termination efforts to obtain the same position from which she was discharged, *i.e.* her first application for a claims adjuster position to the extent that she was, in fact, seeking the liability adjuster position. Correspondingly, the distinct failure to hire claim must embrace only her attempts to enter into a new relationship with her former employer in a position different from the one previously held, *i.e.* the first application to the extent that plaintiff was not pursuing the liability adjuster position and the third and fourth applications for tax clerk, tax assistant or tax analyst positions in the Tax Department.[2] However, in her complaint, plaintiff expressly limits this failure to hire claim to the third application for a tax clerk or tax assistant position in the Tax Department. Therefore, I need only address the first and third employment applications in conjunction with plaintiff's failure to rehire and failure to hire claims, but even if all viable applications are considered these claims must fail.

■ Plaintiff's claim of discriminatory and retaliatory failure to rehire is not cognizable as a matter of law under either Title VII or § 1981. Plaintiff is barred from maintaining a failure to rehire claim pursuant to Title VII because she neglected to file such a charge with the Equal Employment Opportunity Commission. *See* 42 U.S.C. § 2000e–5(e) & (f)(1); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 554–55 & n. 4, 97 S.Ct. 1885, 1887 & n. 4, 52 L.Ed.2d 571 (1977). Moreover, a refusal to rehire fails to state a claim under § 1981. "Reinstatement of the identical employment relationship, with the same rights, duties and obligations of the old agreement, is not a new and distinct relation covered by § 1981." *Carter v. O'Hare Ho-*

*tel Investors,* 736 F.Supp. 158, 160 (N.D.Ill. 1989); *accord Cashie v. Harris Corp.,* 742 F.Supp. 1133 (M.D.Fla.1990); *Eklof v. Bramalea Ltd.,* 733 F.Supp. 935, 937 (E.D.Pa. 1989); *see Patterson, supra,* 491 U.S. at ——, 109 S.Ct. at 2372–73. Thus, even assuming that plaintiff has alleged a factual basis for her Title VII and § 1981 failure to rehire claim, that claim must fail.[3]

■ Likewise, there is no merit to plaintiff's § 1981 claim of discriminatory and retaliatory failure to hire. In order to establish a *prima facie* case of retaliation pursuant to § 1981, an individual must show by the preponderance of the evidence (1) that he or she was engaged in a protected activity; (2) that he or she suffered an adverse employment decision; and (3) a causal connection between the protected activity and the adverse employment decision. *Taitt v. Chemical Bank,* 849 F.2d 775, 777 (2d Cir.1988). It is uncontested, first, that plaintiff engaged in protected activity when she filed the action in this court and, second, that her employment application of June 20, 1989—as well as every other application—was rejected by Continental and UAC. Plaintiff, however, has failed to offer even a shred of evidence to establish the requisite link between her protected activity and the failure to hire. She apparently claims that the causal link between the protected activity and defendants' failure to hire her was the requirement on the employment application form that former employers be listed, thereby requiring her to list UAC and, thus, precipitating review of her lackluster employment record. Such an assertion, pure nonsense, fails to establish the requisite causal link. Because plaintiff is unable to establish a *prima facie* case of retaliation, her § 1981 retaliatory failure to hire claim collapses.

---

**2.** The barebones second employment application cannot possibly support plaintiff's failure to hire claim, because it is too much to expect, as plaintiff nonetheless asserts, that even though she failed to specify on the application the position(s) she desired, defendants were somehow obliged to consider her for any available position for which she was minimally qualified.

**3.** In the alternative to dismissal of the § 1981 failure to rehire claim on procedural grounds, this claim would be dismissed on the merits pursuant to the analysis employed for the failure to hire claim. *See infra* pp. 282–84.

■ The § 1981 discriminatory failure to hire claim also lacks merit. The burden is upon a plaintiff alleging discrimination pursuant to § 1981 to establish by the preponderance of the evidence that (1) he or she applied for an available position; (2) he or she was qualified for the available position; (3) he or she was rejected for that position; and (4) after he or she was rejected, the employer continued to seek applications for that position. *Patterson, supra,* 491 U.S. at ——, 109 S.Ct. at 2378; *Williams, supra,* 883 F.2d at 1191; *see Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 1094 & n. 6, 67 L.Ed.2d 207 (1981). UAC asserts that no vacant claims adjuster positions were available in New York, New Jersey or Connecticut at the time plaintiff applied on March 30, 1988 and that no such vacancies were filled until June 23, 1988, approximately three months thereafter.[4] Moreover, UAC claims that no permanent tax clerk, tax assistant, accounting clerk or bookkeeper positions in the New York City or Cranford, New Jersey Tax Departments have been vacant since June 20, 1989, the date of plaintiff's third post-termination employment application.[5] Plaintiff has received wide-ranging discovery, yet has been unable to establish that any such vacancies existed or, for that matter, that there were appropriate job vacancies in any UAC office located in an area that she listed as a geographical preference. Accordingly, plaintiff has failed to show by the preponderance of the evidence that she applied for available positions and, thus, her § 1981 discriminatory failure to hire claim cannot stand.

■ Assuming, *arguendo,* that plaintiff had managed to establish a *prima facie* case of either retaliatory failure to hire or discriminatory failure to hire, these claims would, in any event, be dismissed because she has not shown by the preponderance of the evidence that defendants' proffered legitimate business reasons for such failure to hire were pretextual. *See Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095; *Williams, supra,* 883 F.2d at 1192. As legitimate business reasons for its failure to hire plaintiff, UAC asserts, first, that there were no available positions for which she was qualified and, second, that a company policy prohibited the hiring of individuals who had previously been discharged. Even if there were positions available for which she was qualified—and, I reiterate, she has failed to so establish—plaintiff has neither refuted the existence of or her awareness of the eminently reasonable company policy prohibiting the hiring of previously discharged employees nor has she established that this policy was applied to her in a discriminatory or retaliatory manner. Because plaintiff has failed to establish by the preponderance of the evidence that defendants' legitimate business reasons for refusing to hire her were pretextual, the failure to hire claim must fail.

■ Plaintiff's alternative reliance upon a disparate impact analysis to support her § 1981 discriminatory failure to hire claim is misplaced. The protection of § 1981 does not extend to facially neutral conduct having the consequence of burdening one race more than another, but only remedies intentional discrimination. *Croker v. Boeing Co.,* 662 F.2d 975, 989 (3d Cir.1981). While disproportionate impact may be an important factor in establishing racially discriminatory intent, it cannot

---

**4.** Plaintiff listed New York City, New Jersey, Connecticut, California, Texas, Illinois, Washington, D.C., and Virginia as geographical preferences on her application for a claims adjuster position. She was not, however, considered for a claims adjuster position at offices outside New York City because the application had actually been submitted to the New York City office and because UAC, in conformity with a general practice, did not contact offices in secondarily preferred geographical areas for such a low level position. There is no hint whatsoever of discrimination in such a practice.

**5.** Plaintiff's June 20, 1989 application did not list any geographical preferences at all, while her January 9, 1990 application listed, as preferences, New York City, New Jersey, Connecticut, Atlanta, Georgia and Chicago, Illinois. Apparently, plaintiff was not considered for a Tax Department position in Connecticut, Georgia or Illinois because those positions are also considered low level jobs.

alone serve as the basis for such intent unless the pattern of disparity is "sufficiently stark and unexplainable on grounds other than race." *Id.* In this case, 48 Caucasians, 11 Blacks, 4 Hispanics and 1 Asian filled the 64 claims adjuster positions that had become vacant in UAC offices in New York, New Jersey and Connecticut since plaintiff submitted her first post-termination employment application on March 30, 1988. I am far from persuaded that any racial disparity in the filling of these vacancies is so anomalous as to reflect intentional discrimination by defendants against Blacks and, indeed, plaintiff herself acknowledges the statistical insignificance of the impact of this pattern of hiring upon Blacks. *See* Pl.Supp.Bf. at Exh. 4. Plaintiff's own statistical evidence falls woefully short of permitting any conclusion that defendants discriminated against her on the basis of race in failing to hire her for a claims adjuster position.[6]

■ Summary judgment will, thus, be granted in favor of defendants as to all of plaintiff's claims. Defendants, however, also seek attorney's fees pursuant to section 706(k) of Title VII which provides:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee....

42 U.S.C. § 2000e–5(k). A district court properly exercises its discretion in awarding attorney's fees to a prevailing defendant in a Title VII action where it finds that the plaintiff's claim was "frivolous, unreasonable, or groundless, *or* that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978) (emphasis added); *Ford v. Temple Hosp.,* 790 F.2d 342, 349 (3d Cir.1986). A plaintiff's subjective bad faith is not a necessary prerequisite to an award of attorney's fees against him or her, but, rather, an aggravating factor in the fee award determination. *Christiansburg Garment Co.,* 434 U.S. at 421–22, 98 S.Ct. at 700–01; *P. Mastrippolito and Sons, Inc. v. Joseph,* 692 F.2d 1384, 1386 (3d Cir.1982).

Plaintiff's initial Title VII post-termination blacklisting claim was based upon an allegation that defendants had given false and defamatory references to 46 specific prospective employers since August 12, 1982, the date of her discharge from UAC, in retaliation for the filing of two internal charges of discrimination and three charges of discrimination with the EEOC. Summary judgment was granted on that claim in the Order filed October 9, 1987 with the explicit finding that there was absolutely no evidence of blacklisting, and that decision was affirmed by the Third Circuit on April 6, 1989. While the appeal was pending, on June 24, 1988 plaintiff, ignoring that finding, filed yet another Title VII post-termination blacklisting claim in the Southern District of New York. That claim was not grounded upon any facts that had not been considered and rejected when this court granted summary judgment on the original Title VII post-termination blacklisting claim.[7] Thus, plaintiff persisted in litigating her clearly groundless Title VII post-termination blacklisting claim not only after the award of summary judgment by this court, but even after affirmance of summary judgment on that claim by the Third Circuit.

■ Given that plaintiff has been employed for the past two years—despite defendants' alleged concerted effort to

---

6. Correspondingly, because the 64 claims adjuster positions were filled by 33 women, plaintiff's § 1981 claim of failure to rehire based upon sex discrimination is without merit.

7. In the complaint in the Southern District, plaintiff again claims that since August 12, 1982 defendants provided negative verbal and written references to prospective employers, alleging that the most recent negative reference was given in or around June 23, 1987. She did not, however, assert that she was unable to present evidence of this reference to this court prior to its summary judgment decision and, indeed, neither provided any specifics in the Southern District complaint nor mentioned this allegation in subsequent written submissions. Plaintiff also claimed in the complaint that she was blacklisted because defendants refused to provide prospective employers with any reference, but, again, neglected to include any facts to support this allegation.

blacklist her—and earns slightly more than $20,000.00 per year, it is reasonable to expect her to reimburse defendants for $1,000.00 of the substantial attorney's fees they were required to expend in defense of her Title VII post-termination blacklisting claim after it was found to be wholly without merit. Lest a $1,000.00 penalty not adequately convey the message it is intended to convey, I will be blunt: while this court is, as it must be, solicitous of *pro se* litigants, *pro se* status will not insulate an individual when he or she, dragging opposing counsel along the way, determines to make this court her personal playground.

An appropriate order shall issue.

### ORDER

This matter having come before the court on defendants' motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56, and for reasonable attorney's fees, pursuant to section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k); and

For the reasons expressed in this court's opinion dated September 25th, 1990;

IT IS on this 25th day of September, 1990

ORDERED that defendants' motion for summary judgment is hereby granted in its entirety; and it is further

ORDERED that defendants' motion for reasonable attorney's fees is hereby granted in the amount of $1,000.00; and it is further

ORDERED that plaintiff satisfy the $1,000.00 award of attorney's fees against her within thirty days.