**Sue PEREZ, Plaintiff,**

v.

**UNITED AIR LINES, INC.; and International Association of Machinists and Aerospace Workers, Defendants.**

**No. CIV.A.02–F–1967(MJW).**

United States District Court,
D. Colorado.

Feb. 24, 2005.

John R. Olsen, Olsen & Brown, P.C., Niwot, CO, for Plaintiff.

Meghan W. Martinez, Brownstein, Hyatt & Farber, P.C., Denver, CO, Ira Lawrence

Gottlieb, Geffner & Bush, Burbank, CA, for Defendants.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FIGA, District Judge.

This employment discrimination case brought under Title VII comes before the Court on the amended motion for summary judgment filed by Defendant International Association of Machinists and Aerospace Workers ("IAM"), on September 4, 2003 (Dkt.# 26) and the motion for sanctions filed by Defendant IAM on October 20, 2003 (Dkt.# 40).

Defendant IAM originally filed its motion on August 28, 2003, together with one volume of supporting exhibits numbered A–1 through A–22, and a second volume containing excerpts from the depositions of plaintiff, union representatives Miriam Seewald and Rich Pijanowski, and various witness declarations in support of the motion. By Order entered on August 28, 2003, Judge Blackburn struck Defendant IAM's motion for failure to comply with the practice standards in effect in his courtroom, but allowed the defendant until September 8, 2003 to refile a conforming motion. The order did not require a refiling of the supporting documentation. On September 4, 2003, Defendant IAM filed its amended motion for summary judgment and supporting brief. On October 16, 2003, Plaintiff Sue Perez filed her opposition to the motion for summary judgment, together with a separate volume of supporting exhibits numbered 1 through 19. On November 13, 2003, Defendant IAM filed a reply brief.

In addition, on October 20, 2003, Defendant IAM filed a Motion for Sanctions under Rule 11, F.R.Civ.P., and under 28 U.S.C. § 1927, against plaintiff and her counsel, asserting that the filing and main-

tenance of this action was frivolous. On November 14, 2003, plaintiff filed an opposition to the motion for sanctions. On November 25, 2003, Defendant IAM filed a reply brief in support of its Motion for Sanctions, together with a declaration from defendant's counsel in support of the motion.

On October 27, 2003 this case was transferred to the undersigned judge pursuant to the general plan for reassignment of cases. A Final Pretrial Order was entered on November 3, 2003, but the case has not been set for trial. Although Defendant IAM has requested oral argument, the Court has determined that argument will not materially assist it in determining the pending motions.

### PLAINTIFF'S COMPLAINT

Plaintiff alleges that on or about January 26, 2001, she was terminated by Defendant United Air Lines, Inc. ("United") from her position as a customer service representative. The termination resulted from an internal investigation by United into activities of plaintiff which United believed to be violations of company work rules. At the time of her termination, plaintiff was a member of Defendant IAM, a union representing United employees. Plaintiff's complaint, appears to assert that United discriminated against her by terminating her on the basis of gender in violation of Title VII, and retaliated against her for complaining about gender-based discrimination, a protected activity under Title VII. She further appears to allege that the representation provided by IAM following her termination, failed to provide her with fair representation in violation of Title VII, that the union itself discriminated against her based on her gender, and that the union retaliated because she complained of gender-based discrimination by the employer. Plaintiff also alleges that the same conduct of defendants violates the provisions of the Colorado Anti-Discrimination statute, C.R.S. § 24-24-401, *et seq.*

On or about December 9, 2002, United filed for bankruptcy protection in the Northern District of Illinois. Accordingly, plaintiff's claims against United are stayed. Plaintiff proceeded with her claims against IAM. The motion for summary judgment and this Order, therefore, address only plaintiff's claims against the union.

### UNDISPUTED FACTS

Many of the facts relevant to determination of the pending motions are stipulated in the Final Pretrial Order, which was filed after all the summary judgment briefs and therefore supercedes the statements in the briefs. According to the stipulated facts in the Final Pretrial Order, plaintiff, a female, commenced employment with United on or about May 20, 1998. Plaintiff was a member of IAM and was employed by United as a customer service representative for approximately 30 months. She was terminated on ·or about January 26, 2001. As a customer service representative, plaintiff's duties included handling ticketing of passengers, complaints from dissatisfied passengers, seat changes and bookings (Final Pretrial Order, p. 3).

United has promulgated a set of 50 employee rules that if violated by an employee subject the employee to discipline. The rules are enumerated in decreasing order of severity. If an employee violates one of the first 20 rules, the employee is subject to discharge for the first such offense. The rules provide that a violation "will result in discharge unless mitigating factors are considered applicable." (Final Pretrial Order, p. 4.) The first 20 rules address serious offenses, such as offenses of dishonesty or being under the influence of illegal drugs (Final Pretrial Order, pp. 3-4).

In Fall 2000, United charged plaintiff and four other Denver customer service representatives, Fernando Papi, Lee Brooks, Lita McKay and Billie Rodgers, with violations of Rule 18, which prohibits "[d]efrauding or attempting to defraud the Company." (Final Pretrial Order, p. 4.) The charges arose from perceived misuse by the employees of customer problem resolution ("CPR") certificates. Generally, an agent such as plaintiff may issue a CPR certificate, which consists of a discount on a normal fare or an upgrade in class of travel, to a customer who has been "disserviced." The CPR is usually issued at the time of the "disservice." It is "extremely unusual" for a customer service representative to issue a CPR for completely free travel. It is also an "unusual and questionable practice" to issue a CPR to a customer who is not a frequent flyer and who was not himself disserviced.

A United ticket fraud analyst, Ms. Cindy Mulligan [1], conducted an investigative interrogation of plaintiff in the presence of IAM representatives on November 30, 2000, and at a second meeting on January 2, 2001. United confronted plaintiff with several questionable issuances of CPR certificates prepared from her computer terminal. At first, plaintiff failed to answer United's questions at all, and then she claimed that she did not recognize the names of the customers presented to her. She issued a statement to that effect at the November 30, 2000 meeting (Exhibit A–7 to defendant's motion). At the end of the first meeting, United announced that it would hold plaintiff out of service without pay. At the union's insistence, United relented on its position with respect to compensating her while the investigation was ongoing, and agreed to pay plaintiff in the interim between November 30, 2000 and the next meeting, which was set for January 2, 2001 (Final Pretrial Order, p. 6).

At the second meeting, after further denials, plaintiff recanted and admitted to knowing one such customer, Scott Higgins. In addition, according to the Final Pretrial Order, plaintiff admitted, on some date not specified in the stipulated facts, that she gave CPRs to ineligible customers, including a party referred to as the Meltons, and she admitted to exercising poor judgment. Plaintiff reimbursed United for the cost of the CPRs she issued to the Meltons (Final Pretrial Order, p. 4).

Although not specified as stipulated facts in the Final Pretrial Order, Ms. Mulligan's Declaration provides additional background that clarifies the issue relating to the Melton matter. She states:

> With respect to Ms. Perez' conduct, among other things we found was that she had apparently used other people's sign-in codes at their computers to issue CPRs to a party of three named Melton, that were questionable, in that she gave completely free travel worth approximately $900 to customers who were not disserviced, on a day they were not traveling, and who were not frequent United customers. The records we gathered showed that while Ms. Perez' own terminal was idle, adjacent terminals had issued CPR's to the Meltons, thus leading to the conclusion that she had waited for her neighboring customer service agent to leave his or her station in order to use that computer to cover up what she was doing. In our investigation, she was the only United employee we found who had made any such effort to cover up her activity, which in turn raised questions

**1.** Although not identified in the stipulation in the Final Pretrial Order, Ms. Mulligan's Dec-

laration indicates that she is the ticket fraud analyst who conducted the interviews.

about the breadth of her possible improper activity.

Mulligan Declaration, ¶ 5.

Although not stated in the stipulated facts in the Final Pretrial Order, United determined to charge plaintiff with a violation of Rule 18 at the conclusion of the January 2, 2001 meeting, and this is not disputed by plaintiff. *See* Declaration of Rich Pijanowski, ¶ 5.

The grievance procedure under the collective bargaining agreement between United and IAM, upon which the parties rely to resolve disciplinary and other disputes arising under the agreement, calls for two hearings and ultimately arbitration if the matter is not settled and the union deems arbitration appropriate (Final Pretrial Order, p. 4–5). The first proceeding in the disciplinary process is referred to as an Investigative Review Hearing ("IRH"), where each side presents evidence and argument to a United hearing officer, who then makes a written decision summarizing the presentations and reaching a result.

In plaintiff's case, she had her IRH on January 19, 2001 before hearing officer Pamela Graham. Plaintiff was represented at the hearing by Rich Pijanowski, a Union Grievance Committee person (Final Pretrial Order, p. 5). Other representatives of the Union were also present. *See* Pijanowski Declaration, ¶ 7. United charged plaintiff with acts of misconduct relating to giving a lower than authorized fare to her brother, issuance of a CPR upgrade to a customer who was not disserviced, one Higgins, and issuance of the three CPRs and overnight charge waiver to the Melton party of three. Mr. Pijanowski presented a variety of defenses, arguments and objections on behalf of plaintiff, all described in his declaration. It does not appear that plaintiff is complaining about the Union's representation of her at this stage of the process.

On January 26, 2001, Hearing Examiner Graham issued her decision upholding the "level five" discipline imposed by United (Exhibit A–3 to defendant's motion). As explained in the stipulated facts of the Final Pretrial Order, United generally has a policy of not issuing disciplinary suspensions, but instead has a system of discipline levels. Level one is the least serious, level four is the level closest to discharge, and level five is actual discharge. Under the IAM–United collective bargaining agreement, an employee's discipline level can improve with the passage of time and no further incidents of discipline (Final Pretrial Order, p. 4).

Thus, in plaintiff's case, Examiner Graham's decision upheld United's determination to discharge plaintiff. The decision issued by Graham gives a lengthy recitation of the parties' respective positions, and the relevant evidence. For purposes of this decision, the Court notes only that the examiner stated that in reviewing the evidence, and plaintiff's own written statements, "there are many contradictions that lead me to question your [plaintiff's] credibility." (Exhibit A–3, p. 18.)

As stipulated in the Final Pretrial Order, when the IRH process does not resolve the dispute either party may move the process to a Third Step hearing, where once again the parties present their positions in the form of evidence and argument to a United official. In plaintiff's case, she had her Third Step hearing on February 19, 2001 before Hearing Officer Brian Coffman. The union, and indirectly the plaintiff, were represented at the hearing by IAM Assistant General Chair Miriam Seewald (Final Pretrial Order, p. 5). Other representatives of the Union were also present. *See* Declaration of Miriam Seewald, ¶ 26. Ms. Seewald presented a variety of arguments on behalf of plaintiff, and determined not to present other arguments, all as described in her declaration.

On March 5, 2001, Hearing Officer Coffman issued his decision denying plaintiff's grievance and upholding the "level five" discipline imposed by United (Exhibit A–4 to defendant's motion). The decision issued by Coffman gives a lengthy recitation of the parties' respective positions, and a detailed discussion of the relevant evidence. For purposes of this decision, the Court notes only that Hearing Officer Coffman, like Hearing Examiner Graham, took issue with plaintiff's credibility. He found "implausible" plaintiff's explanation that she had issued the CPRs to the Melton party only after she received an e-mail from an unidentified customer requesting her to do so, because the customer had been disserviced. Plaintiff apparently could not recall the name of the purportedly disserviced customer or the circumstances under which he was disserviced (Exhibit A–4, pp. 25–26). The hearing examiner found it was not normal practice to issue a CPR to a third-party for another customer's problem resolution.

Sometime between plaintiff's IRH hearing and plaintiff's Third Step grievance hearing on February 19, 2001, the two male employees who were among the five employees discharged by United for Rule 18 violations, Fernando Papi and Lee Brooks, had their terminations reversed and were reinstated by United. According to the Declaration of Ira Levy, the Assistant General Chairperson of IAM, United agreed to reinstate each employee at a disciplinary level four, one level short of discharge, and without backpay for the time they had been out of work. *See* Levy Declaration, ¶ 7. The exact dates of these events is not clear in the record, but a copy of Papi's reinstatement agreement is dated January 25, 2001 (Exhibit A–19 to defendant's motion).

According to Ms. Seewald, when plaintiff and Lita McKay, another employee terminated as part of United's Rule 18 violation investigation, heard about the reinstatement of Papi and Brooks they complained to her asking "why they were not back to work and the men were." (Seewald Declaration, ¶ 22). Although plaintiff's testimony and sworn statements are not specific as to exactly what she said at what point in time, plaintiff claims and defendant does not deny, that she voiced her view to Seewald that the company had discriminated on the basis of gender when it took back the male employees and not the female employees. *See* Exhibit 2 to plaintiff's opposition, Perez Deposition, pp. 166–67. Plaintiff asserts she requested the union to raise the discrimination argument at the next stage of her grievance. (*Id.,* and Exhibit 3 to plaintiff's opposition, Perez Declaration, ¶¶ 7–8). Plaintiff claims she was told by Seewald that her claim of discrimination was "ridiculous." (Perez Depo., p. 167).

Seewald disputes that she told plaintiff her assertion was "ridiculous," and instead says she explained to Perez and McKay that the company had treated the cases of Papi and Brooks differently because the facts of the cases were different, and not because of gender. Seewald asserts that she told plaintiff that the cases of both Papi and Brooks were also different because each of the men had high seniority with United which is a positive factor, whereas plaintiff was lacking seniority (Seewald Declaration, ¶ 22).

The stipulated facts state that United reinstated Papi and Brooks after their Third Step hearings without backpay, based, in large part, on their seniority in excess of twenty years and cooperation and candor during the investigation.[2] (Fi-

---

**2.** According to Ms. Seewald, Papi had 28 years of seniority with United and Brooks had

23 years of seniority with United (Seewald Declaration, ¶ 41). According to the United

nal Pretrial Order, p. 7.) Plaintiff admitted in her deposition that Seewald did explain to her that at least part of the reason the company would not take her back was a lack of seniority compared to that of Papi and Brooks (Perez Depo., p. 43). Plaintiff agreed that this result was not "in itself" gender discrimination.

Nonetheless, plaintiff asserts that after she raised the issue of gender discrimination relating to the reinstatement of Papi and Brooks, the union essentially stopped vigorously representing her in her grievance procedure, and failed to bring up the argument of gender discrimination (Perez Declaration, ¶¶ 11–12).

Seewald asserts that prior to the Third Step hearing she gave serious consideration to plaintiff's claim of disparate treatment. She states that she evaluated whether plaintiff was being treated differently because she was a woman, or differently than others who had committed the same offense and had conducted themselves similarly. Seewald states that she discussed the matter not only with other union officials Levy, Pijanowski and Rich Delaney (an IAM representative in charge of all grievance proceedings with United) but also with company representatives Pam Graham and Patti Pirk (Seewald Declaration, ¶ 24). She concluded based on her discussions that plaintiff's situation was different from the reinstated male employees because the differences in seniority, their long records of honesty, their honesty during the investigation and the particular facts of what each grievant had done in each case.

As set forth above, the union did represent plaintiff at the Third Step hearing. Ms. Seewald states in her declaration that

the union continued to vigorously prosecute plaintiff's grievance at the Third Step hearing (Seewald Declaration ¶ 25). Although the Court does not have a record of the presentations made at the hearing, the summary contained in the decision by Hearing Officer Coffman indicates that the union's representation was diligent and thorough (Exhibit A–4 to defendant's motion). However, that decision does not reveal whether the plaintiff's argument that she was being treated in a discriminatory manner was raised at the Third Step hearing. Apparently, based on the analysis performed by Seewald prior to the hearing, gender discrimination was not argued at the Third Step hearing.

As stipulated in the Final Pretrial Order, once the United hearing officer issues the Third Step decision, as occurred here on March 5, 2001, the union decides whether to take the case to arbitration before a neutral decision maker chosen by the parties (Final Pretrial Order, p. 5). In plaintiff's case, the IAM ultimately determined not to pursue arbitration of plaintiff's grievance.

The union asserts that it did not take plaintiff's case to arbitration based on the facts that plaintiff had engaged in serious dishonest conduct, to which she had belatedly admitted, because she lacked credibility, both on a personal level and in terms of the plausibility of her story, and because she lacked the mitigating factor of seniority that had benefited the male employees, as well as McKay who ultimately prevailed in her arbitration (Seewald Declaration, ¶ 39). Seewald's declaration also states that the union took into account a provision contained in the collective bargaining

___

manager who authorized the last chance reinstatements of Papi and Brooks, the reinstatement decisions were "based upon the employee's seniority, the fact that they each had a very good service record with United, the

forthright nature and plausibility of the explanations they offered for their actions, and the urging of the IAM." (Renville Declaration, ¶ 4.)

agreement relating to "long and faithful service" to the company, which she states means ten years in the arbitration context. (*Id.*) The Court, however, does not find any such provision in the excerpts from the collective bargaining agreement contained in Exhibit A–6 to defendant's motion, or any other document before it.

The record reveals that the union certainly considered filing a demand for arbitration of plaintiff's grievance between March 5, 2001, the date of the Third Step decision, and June 4, 2001, when it advised plaintiff that it would not seek arbitration. During this time period the union requested additional information from the company (Seewald Declaration, ¶¶ 29, 30 and Exhibit A–13 to defendant's motion); requested an extension of the deadline for filing the arbitration demand (Seewald Declaration, ¶ 32 and Exhibit A–14 to defendant's motion); discussed with plaintiff the arguments that might be advanced in arbitration (Seewald Declaration, ¶¶ 34–36); and requested plaintiff to furnish a copy of the e-mail which she said corroborated her claim that a disserviced passenger had e-mailed her to request that she give CPRs to the Melton party (Seewald Declaration, ¶ 31). Plaintiff never produced a copy of the e-mail. (*Id.*, ¶ 33).

In addition, the union asserts that during the above-referenced time period it continued to pursue reinstatement of plaintiff with the company, having several conversations with Pam Graham in May 2001 (Seewald Declaration, ¶ 37). According to Ms. Seewald, she suggested that plaintiff be given probation, or perhaps be put in a position where she could not issue CPRs, and she raised arguments of possible discriminatory treatment (*id.*). Ms Seewald's arguments were unavailing. The company was adamant that it would not reinstate plaintiff because it "had no reason to trust [her] and thus did not want her back at

work." (*Id.*) Ms. Graham confirms that she had these conversations with Seewald, as well as her adamancy that plaintiff should not be reinstated (Graham Declaration, ¶ 11). On June 4, 2001, Ms. Seewald notified plaintiff by telephone that the company had refused to agree to her reinstatement, and that the union would not pursue arbitration because of the weaknesses in her case, the apparent acts of dishonesty, the implausibility of her story, and its conclusion that the union could not win at arbitration (Seewald Declaration, ¶ 38). Ms. Seewald confirmed the conversation with a letter the same day, which also mentioned plaintiff's failure to provide the information which the union had requested (Exhibit A–16 to defendant's motion).

On January 9, 2002, plaintiff filed a charge of discrimination with the EEOC asserting claims against both the company and the union (Exhibit 1 to plaintiff's opposition). In her charge plaintiff stated that the "appeal process was prematurely ended and the union and company declined to process my appeal any further." (*Id.*) Plaintiff also stated in her charge that "I had previously complained about discrimination at the company because of my sex." She asserts that she was denied reinstatement because she was female and "had complained about discrimination." (*Id.*) On the form charge under the entry "cause of discrimination" plaintiff checked the boxes that state "sex" and "retaliation." (*Id.*)

As noted above, plaintiff asserts here that the union's decision not to pursue arbitration on her behalf was discriminatory and retaliatory, apparently contending that the union treated her differently from male union members, and that it did not pursue her case through arbitration in retaliation for her complaint about gender-based discrimination at United. She also

appears to contend that the union violated it duty of fair representation under Title VII by acquiescing in the discriminatory conduct she alleges was carried out by United.

## SUMMARY JUDGMENT STANDARDS

■ The purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). In other words, "there must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995), *cert. denied*, 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits. F.R.Civ.P. 56(c). When applying this standard, a court must view the factual record in the light most favorable to the nonmovant. *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 248, 106 S.Ct. 2505.

For the reasons set forth below, this Court agrees with Defendant IAM that there are no disputed genuine issues of material fact regarding its representation of plaintiff in connection with her grievance against United. The union has come forward with plausible reasons for its determination not to file an arbitration on behalf of plaintiff. Plaintiff fails to demonstrate that the union's reasons were pretextual, or that the union was motivated by retaliation or gender-based discrimination.

Accordingly, summary judgment must enter for Defendant IAM and against plaintiff on her claims against the union under Title VII.

## APPLICABLE LAW

■ Just as Title VII makes it unlawful for an employer to discriminate against employees on the basis of gender, so does Title VII make it unlawful for a labor organization to discriminate against its members, or deprive any of its members of employment opportunities, on the basis of gender. 42 U.S.C. § 2000e–2(c)(1) and (2). The analysis of discrimination claims against a union follows the familiar pattern of the *McDonnell Douglas* case. *See Richardson v. Bakery, Confectionary & Tobacco Workers, Local No. 26*, 92 F.3d 1197, 1996 WL 422070 (10th Cir.1996), *cert. denied*, 520 U.S. 1143, 117 S.Ct. 1313, 137 L.Ed.2d 476 (1997). If a plaintiff establishes a prima facie case of discrimination under *McDonnell Douglas*, the union must then rebut the presumption of discrimination by showing a nondiscriminatory reason for its actions. *Id.* at 92 F.3d 1197, 1996 WL 422070 *2. These reasons must be clear and reasonably specific. *Id.*, quoting *Drake v. City of Fort Collins*, 927 F.2d 1156, 1160 (10th Cir.1991).

Title VII also prohibits unions from retaliating against members who have engaged in protected activities. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff generally must demonstrate that: 1) she engaged in protected opposition to discrimination; 2) she suffered adverse an adverse employment action; and 3) a causal connection exists between the protected activity and the adverse action. *See Kendrick v. Penske Transp. Servcs., Inc.*, 220 F.3d 1220, 1234 (10th Cir.2000). While the *Kendrick* case deals with retaliation by an employer, the prima facie case analysis from that decision has been applied in

cases where retaliation by a union is alleged. *See, e.g., Thompson v. United Transportation Union,* 2000 WL 1929963 at *9 (D.Kan.2000).

■ The elements of breach of the duty of fair representation by a union are set forth in the opinion in *York v. AT & T Co.,* 95 F.3d 948 (10th Cir.1996):

To establish a prima facie Title VII claim against a union for a breach of its duty of fair representation, a plaintiff must show that (1) the employer violated the collective bargaining agreement with respect to the plaintiff, (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair representation, and (3) there was some indication that the union's actions were motivated by discriminatory animus.

95 F.3d at 955–56.

■ The *York* decision also holds that a union

is not compelled ... under Title VII to pursue an individual member's grievance if the union reasonably disagrees with the basis for that grievance. A union's statutory duty of fair representation does not oblige it to take action on every grievance brought by every member. *Vaca v. Sipes,* 386 U.S. 171, 191–92, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Indeed, if a union could be compelled to take official action on every grievance, irrespective of merit, the union would quickly deplete its resources and credibility; and the arbitration machinery would eventually become overburdened. *See id.* at 191–92, 87 S.Ct. 903, ....

95 F.3d at 956 (comma omitted).

■ On the other hand, *York* also holds, as plaintiff argues in this case:

Under Title VII, a union may not refuse to file a valid discrimination claim against an employer on behalf of one of its members simply because that member belongs to a particular minority group. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 666–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). We have held that "[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1311 (10th Cir.1980).

95 F.3d at 956. *York* further holds, as Defendant IAM urges:

However, mere inaction does not constitute acquiescence. Acquiescence requires (1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim.

95 F.3d at 956–57.

The principles of these decisions must be applied to the facts relating to plaintiff's alleged claims to determine whether this case presents triable issues for a jury.

**ANALYSIS**

*1. Plaintiff's Claim of Discrimination by the Union*

Plaintiff's claim of gender-based discrimination by the union in the handling of her grievance is based primarily on a comparison of the handling of her claim and the claim of other female union members to the union's handling of the claims of the male employees who were subjected to discipline under Rule of Conduct 18. Plaintiff asserts that the union treated the male union members more favorably than it treated the female union members.

This claim is rather easily disposed of under the stipulated facts of this case. It is undisputed that between November 2000, when the charges against the five employees surfaced, and January 2001, the union was pursuing the grievances of all five employees. In January 2001, United agreed to reinstate the two male employ-

ees—Fernando Papi and Lee Brooks. United at that time did not agree to reinstate the female employees. However, there is no evidence that the different results emanated from any activity of the union. Rather, the decision to reinstate the two male employees was the decision of United, not the decision of the union. To be sure, the union sought reinstatement of each. But it also sought the reinstatement of plaintiff, of McKay through arbitration, and successfully achieved an agreement of reinstatement of Billie Rogers, also a terminated female employee, until United uncovered additional instances of wrongdoing (Final Pretrial Order, p. 7).

The union has presented uncontradicted evidence that United agreed to reinstate the two male employees based upon those two employees' seniority, the fact that they each had a very good service record with United, the forthright nature and plausibility of the explanations they offered for their actions, as well as the urging of the IAM (Renville Declaration, ¶ 4). Plaintiff does not dispute these facts. The stipulation contained in the Final Pretrial Order states that United reinstated Papi and Brooks after their Third Step hearings without backpay, based, in large part, on their seniority in excess of twenty years and cooperation and candor during the investigation (Final Pretrial Order, p. 7). The fact that United determined to reinstate the male employees prior to the Third Step process, while determining not to reinstate any of the female employees prior to the Third Step process, may arguably support at first blush some claim of differential treatment by United. But there is nothing in the record that supports an inference that the union was discriminating against its female members simply because the employer decided to reinstate the male employees. Other than as to the ultimate result, plaintiff has not pointed to any evidence that the handling of grievances of the male members of the union differed from the handling of the female members.

Thus, plaintiff has failed to show that she (or any other female union member) was treated differently by the union than were similarly situated male union members, and therefore she fails to make out a prima facie case on this part of her claims. *See, e.g. Henderson v. Int'l Union,* 263 F. Supp 2d 1245, 1293 (D.Kan. 2003). Even if the different result in the outcomes of the grievances of the male and female members was somehow attributable to the union, the union has come forward with clear and specific nondiscriminatory reasons for the different results which rebuts any suggestion of discrimination. *See Richardson, supra,* 92 F.3d 1197, 1996 WL 422070 at *2. Once an employer, or in this case a union, comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997), citing to *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). Demonstrating pretext gets plaintiff "over the hurdle of summary judgment." *Id.* *Morgan* goes on to explain that "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [union's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [union] did not act for the asserted non-discriminatory reasons." *Id.* (Internal quotation marks omitted.)

Here, plaintiff has failed to demonstrate that the union's reasons for the different results of the grievances was pretextual. It is stipulated that "United reinstated

Fernando Papi and Lee Brooks, based, in large part, on their seniority in excess of twenty years and cooperation and candor during the investigation." (Final Pretrial Order, p. 7.) No evidence of ulterior motives by the union has been presented. The union is entitled to summary judgment on plaintiff's claim that it discriminated against her in violation of Title VII.

### 2. Plaintiff's Claim of Retaliation by the Union

 As described above, here plaintiff claims that once she raised an assertion that the reinstatement of the male employees was discriminatory, the union retaliated against her by not thoroughly and vigorously representing her. Generally it is possible to find retaliation when a union refuses to represent an employee because the employee has opposed illegal discrimination by the employer. See *Henderson, supra,* 263 F.Supp.2d at 1293, citing to *Romero v. Union Pacific R.R.,* 615 F.2d 1303, 1310 (10th Cir.1980). However, here, as in *Henderson,* the facts do not support such a finding for several reasons.

First, the objective undisputed evidence shows that the union continued to vigorously represent plaintiff after she raised her concern in January 2001 about perceived discriminatory conduct by United. It is undisputed that the union represented plaintiff at her Third Step hearing on February 19, 2001. It is undisputed that after that hearing, the union preserved plaintiff's right to arbitration (*see* Exhibit A–14 to defendant's motion), and expended effort evaluating whether her case should be taken to arbitration. It is undisputed that the union attempted to gain additional information regarding plaintiff's grievance, both from United (*see* Exhibit A–13 to defendant's motion) and from the plaintiff herself (*see* Exhibit A–16 to defendant's motion and Seewald Declaration, ¶ 31). It is undisputed that aside from the possible

formal arbitration step, the union through Ms. Seewald continued to press informally for plaintiff's reinstatement through conversations with company representative Pam Graham. It is undisputed that the union consulted with plaintiff on approaches to the possible arbitration, and kept plaintiff apprised of the status of the information it was receiving from the company (Seewald Declaration, ¶¶ 28, 34–36). It is undisputed that despite requests from the union, plaintiff never produced the e-mail she claimed to have received from the unidentified customer who she said was "disserviced" and requested the compensatory benefits be issued to the Melton party.

Thus, plaintiff's perceptions and assertions that the union "simply abandoned her when she complained about discrimination" (plaintiff's opposition, p. 19) and that the union "dropped me like a stone" (Perez Declaration, ¶ 15) are contradicted by undisputed, objective facts of record. Therefore, plaintiff has failed to demonstrate that she suffered an "adverse action" from the union as a result of her claim of discrimination by the employer. She has failed to provide the proof required under the second prong of proving a prima facie claim of retaliation.

In addition, plaintiff asserts that the retaliatory conduct of the union is evidenced by its different handling of Lita McKay's grievance. While plaintiff is correct in stating that the union decided to take Ms. McKay's grievance to arbitration, this in itself is not a basis for a finding of retaliation on the part of the union. Even if the union's refusal to take her grievance to arbitration is considered an "adverse employment action," she fails to demonstrate a causal connection between that decision of the union and her complaining about discrimination by United.

First, there is evidence of record that Ms. McKay, like plaintiff, also raised the notion with Ms. Seewald that the different treatment of the male employees by United could be indicative of gender-based discrimination (Seewald Declaration, ¶ 22). Plaintiff cannot credibly dispute this assertion. If complaining about discrimination was truly enough to prompt retaliatory treatment by Seewald, the retaliation should have been reflected in the treatment of Ms. McKay's grievance as well.

Second, while plaintiff states that Ms. Seewald dismissed her suggestion of discrimination as "ridiculous," Seewald testified that she treated the allegation seriously. Seewald states that she considered the allegation, and at some point explained to plaintiff why the male employees were treated differently. Plaintiff admitted in her deposition that Seewald did explain to her that at least part of the reason the company would not take her back was a lack of seniority compared to that of Papi and Brooks (Perez Depo., p. 43). Plaintiff agreed that this result was not "in itself" gender discrimination. (*Id.*)

Third, the union has come forward with a reasonable explanation of why it determined to take Ms. McKay's grievance to arbitration, while not so pursuing plaintiff's grievance. The union explains here that it perceived Ms. McKay to have a stronger case for reinstatement than plaintiff because Ms. McKay had 18 years of seniority, compared to plaintiff's 30 months. The seniority of Ms. McKay was certainly a factor the arbitrator took into consideration when she decided in February 2003 to order McKay's reinstatement.[3] While the union could not have known in June 2001, when it declined to arbitrate

plaintiff's grievance, that the arbitrator in the McKay proceeding would in fact attribute weight to McKay's seniority in reaching her decision, it was certainly a factor the union could take into account in deciding whether to proceed with arbitration on behalf of plaintiff. As the union argues, seniority is a factor that arbitrators regularly take into account in determining appropriate discipline and mitigating factors. *See, e.g., Local No. 7 United Food and Commercial Workers International Union v. King Soopers, Inc.,* 222 F.3d 1223, 1226 (10th Cir.2000). Plaintiff has come forward with no evidence to show that the union's reasons for treating Ms. McKay's grievance differently because she had more seniority were pretextual.

The union also explained that it did not believe it could be successful in taking plaintiff's case to arbitration because plaintiff's credibility was in doubt as a result of statements she had made both during the United investigation and during the grievance process. As reflected in the record detailed above, United investigator Mulligan, Hearing Examiner Graham, and Hearing Officer Coffman, all voiced disbelief of plaintiff's answers and explanations of her conduct. Thus, the union's professed concern over the perception of plaintiff's credibility and dissembling was not pretextual.

Plaintiff argues that this reason for differential treatment is pretextual because Ms. McKay also had credibility problems. The union acknowledges Ms. McKay also had some credibility issues, but as evaluated by Ms. Seewald, they were not as serious as those of plaintiff as they did not go to the heart of the conduct at issue (See-

**3.** In her arbitration decision in the McKay grievance, the arbitrator stated that: "However, if her [McKay's] 18 years of unblemished service have meant anything, it means that on these facts, she should be given one last op-

portunity to demonstrate to the Employer that she can be a quality, trustworthy employee, as presumably she had been up until the incidents in question." (Exhibit A-12 to defendant's motion, at p. 19).

wald Declaration, ¶ 46). Plaintiff has not rebutted this explanation either or demonstrated that it was pretextual. In any event, plaintiff fails to explain why she was allegedly singled out for retaliation and not Ms. McKay when both brought to the union's attention possible disparate treatment based on gender.

Based on the evidence set forth above, plaintiff has failed to demonstrate that there are triable disputed issues of fact for a jury to decide with respect to her claim of retaliation by the union against her for making allegations of gender-based discrimination by United.

### 3. *Plaintiff's Claim of Breach of Fair Representation by the Union*

As noted above, in order for plaintiff to establish a prima facie case for breach of the duty of fair representation under Title VII, plaintiff must first show that her employer violated the collective bargaining agreement. Plaintiff's complaint is far from clear in specifying how she alleges United violated the collective bargaining agreement. Plaintiff appears to assert either that United's decision to terminate her was erroneous because the allegations against her were "false or exaggerated" (Complaint, ¶ 25), or that the decision to terminate was discriminatory because male employees who committed the same alleged offenses were not terminated (Complaint, ¶ 26), or that the company was retaliating against her for making complaints of discrimination to a company supervisor prior to her termination (Complaint, ¶ 17).[4]

However, in relation to such allegations neither plaintiff's complaint, nor her opposition brief, cite to specific provisions of the collective bargaining agreement that she claims United violated.

The union, on the other hand, explains that in order for plaintiff to demonstrate a breach by United of the collective bargaining agreement she must show that United lacked "just cause" to discharge her and to refuse reinstatement (Defendant's motion, p. 7). The union expends much effort in attempting to demonstrate that United had valid grounds for terminating plaintiff, and plaintiff responds that she did not defraud the company and broke no work rules (Plaintiff's opposition, pp. 12–14). The Court need not resolve this dispute in order to rule on the pending motion for summary judgment on the claim of breach of the duty of fair representation.

■ Even assuming, as plaintiff urges, that United violated the collective bargaining agreement in some fashion, in order to prevail against the union under Title VII she still must show that the union acquiesced in the violation and that it did so due to a discriminatory animus. To make this showing, plaintiff again points to the fact that the union did not take her claim to arbitration, and asserts that it did not raise discriminatory treatment as compared to the male employees.

Here, as shown above, the union did not "acquiesce" in the alleged violation of the collective bargaining agreement. Rather, the union vigorously advanced plaintiff's

---

**4.** Plaintiff's own testimony regarding these alleged complaints of discrimination that she alleges led United to retaliate against her undermines her claim that the union "acquiesced" in impermissible retaliatory conduct by United. Plaintiff herself could not recall when she made the alleged complaints, what she said, who she claimed received favorable treatment from the company or the form of the discriminatory treatment (*see*

Perez Depo., pp. 35–37, accompanying defendant's motion). Moreover, there is no statement by plaintiff in her declaration, or indicated in her deposition testimony, that she related to the union that she had made these pre-termination complaints to her supervisor. Thus the union cannot be said to have ignored her claim of retaliatory treatment by United.

grievance, as it did the grievances of all five of the disciplined employees. To be sure, the union achieved different levels of success with respect to each employee's grievance, but that does not evidence acquiescence by the union.

▮ In plaintiff's case, the union decided against filing for arbitration. Plaintiff would characterize this decision as failing to properly represent her and abandoning her (Plaintiff's opposition, p. 19). Yet the caselaw in this circuit is clear: a union is not compelled under Title VII to pursue an individual member's grievance if the union has a reasonable basis for disagreeing with the basis for the grievance. *York, supra,* 95 F.3d at 956. The union articulated to plaintiff in 2001 the reasons why it would not take her case to arbitration. The union has repeated those explanations here, supported by documents, declarations and testimony. There is no indication that the union's reasons are created "after the fact" as plaintiff suggests, or that the reasons are otherwise pretextual. Rather, as indicated above, the Court finds the union could, and reasonably did, disagree with plaintiff's request to arbitrate. Such decision cannot be found by a reasonable jury to amount to prohibited discriminatory acquiescence in the employer's conduct.

▮ A separate duty may rest on the union here based on plaintiff's assertion that the employer subjected her to discriminatory or retaliatory treatment. As stated in *York, supra,* "[u]nder Title VII, a union may not refuse to file a valid discrimination claim against an employer on behalf of one of its members simply because that member belongs to a particular minority group," 95 F.3d at 956, citing to *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 666–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). But again, the issue turns on whether the union acquiesced in the company's prohibited discrimination. As also stated in *York,* mere inaction does not constitute acquiescence. Rather the union has to know of the prohibited discrimination, and make a determination not to assert the discrimination claim. *York, supra,* 95 F.3d at 956–57.

Here, plaintiff has made some showing that the union, at least through Ms. Seewald, had some perception that the fact that the two male employees had been reinstated "didn't look good" and on the "face of it" it could be seen as discrimination. (Exhibit 18 to plaintiff's opposition, Seewald Deposition, p. 35). This perception, however, does not prove that the union had knowledge of prohibited discrimination, for as Ms. Seewald makes clear, the perception would not hold if one knew the "facts of the case or the history of each case."

In any event, the union did not simply validate this perception, thereby acquiescing in United's action. Rather, as Ms. Seewald testified, she raised the perception with other union officials and company representatives (*Id.,* pp. 31–37; Seewald Declaration, ¶ 24). The perception of discrimination was addressed based on the facts and merits of each employee's case. Ultimately, as explained above, the union reached the view that the cases of Papi and Brooks were different, and that the different treatment they received was not gender based discrimination. On this record, a reasonable jury could not find that the union violated its duty of fair representation to plaintiff by acquiescing to any alleged employer discrimination.

Accordingly, the court finds that Defendant IAM is entitled to summary judgment on plaintiff's claim of breach of duty of fair representation in violation of Title VII.

## PLAINTIFF'S CLAIMS UNDER COLORADO ACT

▮ Plaintiff makes no argument that her claims against the union are subject to different analysis under the Colorado

Anti–Discrimination Act, and in fact does not even address that statute in her opposition. Colorado courts, in applying the Colorado anti-discrimination law, C.R.S. § 24–34–402, essentially rely on the same burden-shifting framework established by federal courts for determining Title VII cases. *See Colorado Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399–400 (Colo.1997). Accordingly, for the same reasons plaintiff's claims fail under Title VII, the claims are subject to summary judgment under the Colorado Act.

## DEFENDANT IAM'S MOTION FOR SANCTIONS

Defendant IAM moves for sanctions under both Rule 11, F.R.Civ.P., asserting that plaintiff's complaint was frivolous, legally unreasonable, without factual foundation and was brought for an improper purpose, and under 28 U.S.C. § 1927, asserting that plaintiff and her counsel unnecessarily multiplied proceedings in this case by continuing to pursue the case after discovery revealed what defendant claims were "fatal deficiencies" in plaintiff's case (Defendant's reply brief in support of sanctions, p. 7).

▆▆▆ Defendant's Rule 11 motion points to certain paragraphs in the complaint which are asserted to be unsupportable (*see* defendant's motion, pp. 10–11). One of the paragraphs relates to plaintiff's claimed damages, but the Court has no information regarding this matter and has made no rulings relating to damages. Another paragraph relates to plaintiff's claim of retaliation by United, which the Court has addressed. While the Court agrees that plaintiff's testimony undermined the validity of this claim, in and of itself the allegation does not provide a basis for sanctions as it is a minor part, if any part at all, of plaintiff's case against the union. Finally, the union points to plaintiff's claim that male employees of United received more favorable treatment than the female employees as indicative of a frivolous claim.

▆▆▆ While the Court has determined that plaintiff has not come forward with sufficient evidence to present to the jury the issue of whether the union breached its duty of fair representation to plaintiff regarding this claim, the Court cannot agree that plaintiff's allegation insofar as it was made against the company was frivolous. After all, even Ms. Seewald acknowledged that the company's agreement to reinstate the terminated male employees at first "didn't look good," suggesting that it might be indicative of discrimination. Plaintiff developed this evidence in Ms. Seewald's deposition, and Ms Seewald made the acknowledgment referenced above. Thus, the Court cannot say that plaintiff's pursuit of this claim was frivolous or spurious, even though plaintiff did not provide sufficient evidence to try the claim to a jury.

For these reasons, and for the reason that the Court does not find plaintiff's complaint was frivolous or without factual foundation, DENIES the request for sanctions under Rule 11.

▆▆▆ Similarly, the Court does not find a basis for sanctions under 28 U.S.C. § 1927 for vexatiously multiplying proceedings. Here, it appears that discovery was closed on July 31, 2003. The union filed its motion summary judgment shortly thereafter, and the plaintiff responded promptly to the union's motion for summary judgment. As noted above, the parties also reached numerous stipulations to include in the Final Pretrial Order, apparently based in part on the exchange of fact assertions contained in the summary judgment briefs. Thus, there is no indication that unnecessary or wasteful litigation followed the filing of the summary judgment motion, such as excessive additional discovery or depositions, or the filing of unneces-

**1248**

sary motions. Nor does it appear that plaintiff engage in any delaying tactics. Thus while defendant asserts that the discovery and summary judgment briefing revealed fatal deficiencies in plaintiff's case, on this record the Court declines to award sanctions under the statute.

## CONCLUSION

Defendant IAM's motion for summary judgment is GRANTED (Dkt. # 26).

Defendant IAM's motion for sanctions is DENIED (Dkt. # 40).

Pursuant to Rule 54(b), F.R.Civ.P., the Court finds that there is no just reason for delay in the entry of judgment in favor of Defendant IAM, and therefore the Clerk of the Court is directed to enter judgment in favor of Defendant IAM and against plaintiff on her First and Second Claims for Relief. Costs are awarded to Defendant IAM under Rule 54(d)(1), as the prevailing party.

Plaintiff's claims against Defendant United are dismissed without prejudice. They are subject to refiling at such time as the United bankruptcy stay is lifted, or plaintiff may seek such relief as she deems appropriate in the pending United bankruptcy proceedings in the Northern District of Illinois.